# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| IGNACIO MARIN, | ) | No. 72666-8-I |
| | ) | |
| Appellant, | ) | DIVISION ONE |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| KING COUNTY, WASHINGTON, | ) | |
| | ) | |
| Respondent. | ) | FILED: June 6, 2016 |
| | ) | |

LEACH, J. — Ignacio Marin appeals the dismissal of this lawsuit against his former employer, King County (County). Marin alleged disparate treatment, hostile work environment, and failure to accommodate disabilities while he worked in the County's Wastewater Treatment Division (WTD). The trial court dismissed Marin's disparate treatment claim on summary judgment. After the close of evidence at trial, the court directed a verdict for the County on Marin's claim of hostile work environment based on retaliation. The jury then rendered unanimous defense verdicts on the remainder of Marin's hostile work environment claim and on his failure-to-accommodate claim. On appeal, Marin makes 18 assignments of error. Because he fails to support several assignments with adequate argument, citations to the record, and legal authority, and the remaining assignments lack merit, we affirm.

BACKGROUND

Substantive Facts

Ignacio Marin immigrated to the United States from Peru in 1975. In 1982, he began working as an operator for WTD at the West Point Treatment Plant in Seattle. Marin suffers from anxiety, depression, and panic attacks.

Operators at King County wastewater treatment plants work on crews of five or six people led by a shift supervisor. They have responsibility for various types of wastewater treatment equipment, some of it hazardous. They also respond to emergencies, ensure compliance with safety procedures, and clean the plant.

Marin joined D Crew at West Point in 2007. His supervisor was James Sagnis, who at times appointed Mark Horton, the most experienced crew member, as a temporary supervisor. Marin had a turbulent relationship with Sagnis and Horton. In April 2009, Horton complained to Sagnis that Marin refused to follow a "priority directive" that the plant manager had issued. The directive requested that all employees assist in quickly cleaning the plant's preaeration tanks. Marin worked on the priority tasks for less than an hour and spent most of two days performing other, low-priority work. When Horton confronted Marin, Marin told him the preaeration work made him ill. Horton informed Sagnis that he suspected Marin was using sickness as an excuse to

avoid doing the unpleasant priority tasks. Marin secretly recorded two conversations with Sagnis about these accusations. In May, Sagnis gave Marin a "documented oral reprimand." Marin promptly filed a union grievance of the reprimand. The County later investigated the incident, concluded that the reprimand was based on a misunderstanding, and withdrew it.[1]

In June, Marin complained to WDT's human resources department (HR), alleging a hostile work environment. The County hired an independent investigator, Karen Sutherland, to investigate these complaints. She found no evidence to support Marin's accusations.

The same month, following his conflict with Sagnis, Marin requested, and the County granted, a transfer to Jim Alenduff's C Crew at the South Plant in Renton. This assignment was initially temporary. Meanwhile, that October, Sagnis told an HR staff member that Marin had "shit all over the crew" and "it would not be pleasant" if he returned. The County gave Sagnis a written reprimand for threatening retaliation against Marin.

Like other West Point operators, Marin considered South Plant a desirable assignment because of its more convenient location. Because of the size of South Plant and its differences from West Point, however, Marin needed training to be proficient in the new plant. At his crew's request, Alenduff restricted

---

[1] The County withdrew the reprimand in March 2010.

Marin's work duties while his assignment was temporary. He later explained that Marin repeatedly made errors on C Crew that put crew members in "jeopardy."

In response, Marin complained to HR that he was not receiving meaningful assignments, the crew did not want him working in their areas, and they were aggressive toward him when he made mistakes. Marin alleged that members of C Crew harassed, discriminated against, and retaliated against him. The County again hired Sutherland to investigate, but this time Marin did not cooperate. Sutherland again found no evidence of discrimination.

As Marin's reassignment to South Plant had been temporary, the County offered to return him to West Point. But after the conflicts on C Crew and after meeting B Crew supervisor Cheryl Read, Marin decided to remain at South Plant and move to B Crew. He began on that crew in late October 2009. Meanwhile, through his attorney, Marin anonymously reported to the County that Alenduff had shown obscene computer images to coworkers, including a female custodian. Alenduff was eventually forced to resign.

In early 2010, Marin asked the County to make his transfer to Read's crew permanent to accommodate his posttraumatic stress disorder (PTSD). The County agreed in April 2010.

While on B Crew, Marin repeatedly told HR and disability services he was happy with his new supervisor and crew and did not need more

-4-

accommodations. In December 2010, however, Marin did not follow the correct procedure to "lock out" and "tag out" a sewage pump. Marin approached Read and told her about the incident on the same day. Read saw it as a basic error for someone with Marin's experience. Marin perceived Read to be yelling at him and became anxious. He told her he had to visit his doctor and left early. Read did not see Marin again until January 1, 2011. That week, she and Marin walked through the procedure he should have followed, and she gave him a Teach/Lead/Coach memo, or TLC. A TLC is not discipline, though management may base future discipline on a TLC.

Marin took medical leave on January 5. The County asked for medical information and tried to engage him in its process. Marin sent notes from two doctors saying that work had aggravated his "acute situational stress" and PTSD.[2] The County requested more information. Marin did not provide it. Instead, he gave notice he would retire in May 2011.

Procedural Facts

Marin sued the County in July 2011. He alleging six causes of action: disparate treatment, hostile work environment, and failure to accommodate

---

[2] One of Marin's doctors acknowledged at trial that Marin "probably" did not have PTSD under the accepted definition.

disabilities under the Washington Law Against Discrimination[3] (WLAD), wrongful discharge, and both intentional and negligent infliction of emotional distress.

At the County's request, the court found that Marin's recordings of his conversations with Sagnis violated the privacy act[4] and excluded the recordings and Marin's observations of the conversations. The court also sanctioned Marin's counsel $5,000 for failing to disclose the recordings' existence until after her firm deposed Sagnis.

After discovery, the trial court dismissed on summary judgment four of Marin's claims: disparate treatment under WLAD, wrongful discharge, and both types of emotional distress. Before trial, the court excluded evidence about allegations that occurred before the limitations period began in May 2008, with limited exceptions. The court also ruled that Marin could not offer evidence that any coworker retaliated against him without first laying the foundation that the coworker was aware of Marin's discrimination complaint.

The parties tried the case over 15 days in September 2014. During voir dire, juror 71 disclosed on his questionnaire and in response to further questions from Marin that he was a "[g]ood friend with a King County prosecutor." The trial court declined to dismiss juror 71 at that point.

---

[3] Ch. 49.60 RCW.
[4] Ch. 9.73 RCW.

During trial, the trial court struck a statement by Marin's coworker Lloyd Holman that he heard from unidentified coworkers that Marin had complained against Alenduff. The court had conditioned that statement's admission on Marin "t[ying] it up" with evidence of the speakers' identities and the statements' timing—evidence Marin did not provide. Later, the trial court allowed the County's expert, Dr. McClung, to testify that Marin had "adjustment disorder with paranoid personality traits." But the court excluded any "comment on credibility" from McClung, such as testimony that Marin "is likely to perceive harassment."

At the close of evidence, the court granted the County's request for a directed verdict in part. It dismissed the retaliation component of Marin's hostile work environment claim but allowed the jury to decide the rest of his hostile work environment claim and his accommodation claim. The jury then rendered unanimous verdicts for the County on those claims. The court awarded the County $14,378.37 in costs. Marin appeals.

ANALYSIS

Exclusion of Recorded Conversations and Resulting Discovery Sanctions

Marin challenges the trial court's exclusion of evidence of his conversations with his D Crew supervisor, James Sagnis, and its imposition of sanctions against his counsel for delayed disclosure of recordings of those conversations. This court denied discretionary review of these rulings.

We review a trial court's interpretation of statutes and court rules de novo.[5] We review for abuse of discretion a trial court's choice of sanctions for violation of a discovery order.[6]

Marin first contends that his conversations with Sagnis were not "private" under RCW 9.73.030. No statute defines the term "private." To determine whether a conversation is private under the privacy act, we consider "(1) the subject matter of the communication, (2) the location of the participants, (3) the potential presence of third parties, (4) the role of the interloper, (5) whether the parties 'manifest a subjective intention that it be private,' and (6) whether any subjective intention of privacy is reasonable."[7]

Here, Marin and Sagnis had lengthy conversations in an office at work that involved only the two of them. No third party was present. Marin does not meaningfully distinguish Smith v. Employment Security Department,[8] where the court found conversations between public employees in an office to be private as a matter of law. Nor does he cite to authority to support his argument that the conversations were "public in nature" because they were between two government employees who each later revealed parts of what was said. We

---

[5] Nevers v. Fireside, Inc., 133 Wn.2d 804, 809, 947 P.2d 721 (1997).
[6] Burnet v. Spokane Ambulance, 131 Wn.2d 484, 494, 933 P.2d 1036 (1997).
[7] State v. Mankin, 158 Wn. App. 111, 118, 241 P.3d 421 (2010) (quoting State v. Christensen, 153 Wn.2d 186, 193, 102 P.3d 789 (2004)).
[8] 155 Wn. App. 24, 39, 226 P.3d 263 (2010).

distinguish the cases Marin does cite on the basis that they involve documents rather than conversations.[9]   Following Smith, we conclude that Marin's conversations with his supervisor were "private" under RCW 9.73.030.   A violation of the privacy act requires exclusion of "all evidence" of the contents of the illegally recorded conversations.[10]   Thus, the trial court did not err in excluding the recordings and other evidence regarding the meetings.

Second, Marin argues that even if the trial court properly excluded the recordings, it erred in sanctioning his attorney, Mary Ruth Mann.  But the record contradicts Marin's assertion that his attorneys produced the recordings "seasonably."  An attorney at Mann's firm, Mark Rose, acknowledged that he knew of the recordings 10 days before the deposition and knew that they were responsive to the County's discovery requests.  Rose then told Mann about the recordings.  Rose deposed Sagnis, then waited 6 more days to produce the recordings.  The trial court acted within its discretion in sanctioning Mann based on this conduct.  The other facts Marin recites are irrelevant and obfuscatory.

While it sanctioned Mann $5,000, the trial court denied the County's request to dismiss the case.  Marin contends, again without meaningful support,

---

[9] Bellevue John Does 1-11 v. Bellevue Sch. Dist. No. 405, 164 Wn.2d 199, 215, 189 P.3d 139 (2008) (employee evaluations under the Public Records Act, ch. 42.56 RCW); Morgan v. City of Federal Way, 166 Wn.2d 747, 756-57, 213 P.3d 596 (2009) (investigative report involving judge's conduct).

[10] RCW 9.73.050; see Schonauer v. DCR Entm't, Inc., 79 Wn. App. 808, 819, 905 P.2d 392 (1995).

that this court should reverse the sanction because the trial court erroneously "applied CR 37 case law" to his counsel's violation of CR 26(g). Marin acknowledges, though, that the standard for sanctions under CR 37 is higher than under CR 26(g). And, in any case, the trial court considered CR 37 standards only in declining to sanction Marin with dismissal. Thus, the error that Marin asserts, if it occurred, was harmless.

Finally, Marin contends that the trial court improperly considered Mann's history of sanctions when deciding the appropriate sanction here. The trial court "deem[ed] th[e] violation to be serious, particularly in light of Ms. Mann's history of sanctions in previous cases." This is not, as Marin contends, an improper use of character evidence to determine that Mann's conduct was "willful." A trial court may consider an attorney's history of misconduct in determining appropriate sanctions.[11] The trial court did not err in doing so here.

Summary Judgment on WLAD Disparate Treatment Claim

Marin next challenges the trial court dismissal on summary judgment of his disparate treatment claim. He based that claim on two theories: discrimination against him as a member of a protected class and retaliation against him for protected activity.[12] We review a grant of summary judgment de

---

[11] In re Disciplinary Proceeding Against Cohen, 150 Wn.2d 744, 760 n.8, 761-62, 82 P.3d 224 (2004).

[12] Marin repeatedly cites to the trial transcript to support his contentions that summary judgment was inappropriate. This court restricts its review to the

novo, considering the same record as the trial court in the light most favorable to the nonmoving party.[13] Summary judgment is appropriate only when there is no genuine issue as to any material fact.[14]

*Disparate Treatment Based on Protected Status*

The elements of a prima facie case for disparate treatment based on protected status are not absolute but vary based on the relevant facts.[15] The parties agree that Marin is a member of one or more protected classes. Marin must also show that he suffered a tangible adverse employment action. This means "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."[16] He must also show that the action occurred under circumstances that raise a reasonable inference of unlawful discrimination and that he was doing satisfactory work.[17] If Marin makes this

---

record before the trial court at summary judgment. Boguch v. Landover Corp., 153 Wn. App. 595, 608, 224 P.3d 795 (2009).

[13] Camicia v. Howard S. Wright Constr. Co., 179 Wn.2d 684, 693, 317 P.3d 987 (2014); Young v. Key Pharm., Inc., 112 Wn.2d 216, 226, 770 P.2d 182 (1989).

[14] CR 56(c); Camicia, 179 Wn.2d at 693.

[15] See Grimwood v. Univ. of Puget Sound, Inc., 110 Wn.2d 355, 362-63, 753 P.2d 517 (1988). Both Marin and the County primarily address the elements that follow.

[16] Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998).

[17] Anica v. Wal-Mart Stores, Inc., 120 Wn. App. 481, 488, 84 P.3d 1231 (2004).

prima facie showing, the burden shifts to the County to show legitimate, nondiscriminatory reasons for its adverse employment action.[18] If the County produces this evidence, the burden returns to Marin to show that the County's reasons are pretextual. This means they "(1) have no basis in fact, (2) were not really motivating factors for the decision, or (3) were not motivating factors in employment decisions for other employees in the same circumstances."[19]

Marin failed to make the required prima facie showing. First, he did not present evidence of an adverse employment action. None of the actions he points to, many of which he misrepresents, amount to a tangible change in employment status.[20] He alleges a general pattern of harassment but does not support it with citations to the record adequate for this court to review.[21]

The record does not, in any case, support Marin's assertions. The TLC Marin received on B Crew was not an adverse employment action. It did not

---

[18] Kirby v. City of Tacoma, 124 Wn. App. 454, 464, 98 P.3d 827 (2004).

[19] Kirby, 124 Wn. App. at 467.

[20] For instance, Marin describes as "unwarranted discipline" a letter recommending withdrawal of his reprimand from Horton. He mischaracterizes his TLC as containing "threats of discipline." He refers to finding "frightening racial materials at his desk," though the record shows he found the items in a part of the plant where he did not normally work and no one knew he would be. And he asserts without support he "was disciplined for going home sick by collective efforts" of numerous WTD employees.

In arguing he created a genuine issue of material fact as to adverse employment actions, Marin again cites primarily to portions of the trial record, which is not an appropriate basis for review. Boguch, 153 Wn. App. at 608.

[21] See RAP 10.3(a)(6); Hernandez v. Stender, 182 Wn. App. 52, 59, 358 P.3d 1169 (2014).

result in a discharge, demotion, or change his benefits or responsibilities.[22] And while Marin alleges that the County denied him training, he cites only to his expert's report on county safety procedures. That report is not evidence of an adverse employment action. Additionally, the report's conclusions—that WTD's safety procedures were deficient for all employees—contradict Marin's assertion that his supervisors treated him differently.

Second, Marin failed to raise a reasonable inference of discrimination. He points to no evidence that the County took an adverse action against him because of his protected class. Marin contends the County treated him differently than a nonprotected employee, Billy Burton, who also made a lockout error. "Similarly situated employees must have the same supervisor, be subject to the same standards, and have engaged in the same conduct."[23] Even if Marin had shown Burton's error to be analogous to his own, Burton is still not a valid comparator because he worked under a different supervisor.[24] And the record does not show that the County treated Marin differently than Burton, who also

---

[22] See Donahue v. Cent. Wash. Univ., 140 Wn. App. 17, 26, 163 P.3d 801 (2007) (holding that professor did not suffer adverse action where he "did not lose tenure, he was not demoted, and he did not receive a reduction in pay").

[23] Kirby, 124 Wn. App. at 475 n.16; see also Clark v. Runyon, 218 F.3d 915, 918 (8th Cir. 2000).

[24] See Xuan Huynh v. U.S. Dep't of Transp., 794 F.3d 952, 960 (8th Cir. 2015); Rodriguez-Cuervos v. Wal-Mart Stores, Inc., 181 F.3d 15, 21 (1st Cir. 1999) (both finding employees under different supervisors were not similarly situated).

received a TLC—albeit an oral one—after his error. A reasonable employee would not interpret Marin's TLC as setting "impossible or terrifying unique performance standards" or threatening termination.

Even if Marin had made a prima facie showing of disparate treatment, he failed to show the County's reasons are pretextual. Marin does not dispute that the County showed legitimate reasons for each action. In arguing those reasons are pretextual, Marin lists treatment both during and before his time on D Crew. But he does not support that list with specific citations to the record or explain how it shows pretext.[25] No reasonable juror could find from the evidence presented that the County's asserted reasons were pretexts for discrimination. Thus, the trial court properly dismissed Marin's claim of disparate treatment based on protected status.

*Disparate Treatment by Retaliation for Protected Activity*

To establish a prima facie case of retaliation, Marin must show that he engaged in statutorily protected activity, that he suffered an adverse employment action, and that his protected activity caused the County to take the adverse

---

[25] Marin instead cites to swathes of the record up to 120 pages wide. These include a declaration by a former coworker, Norm Cook, alleging he and Marin received disparate assignments from 2000-2003 due to their race. Those events were outside the limitations period, and the trial court explicitly excluded evidence regarding that period from trial.

action against him.[26] If Marin makes this prima facie showing, he must also show that the County's legitimate reasons for its actions were pretextual.[27]

Here, too, Marin failed to present a prima facie case. First, he again failed to show that he suffered an adverse employment action. "An actionable adverse employment action must involve a change in employment conditions that is more than an 'inconvenience or alteration of job responsibilities.'"[28] This includes "reducing an employee's workload and pay," but not, for instance, "yelling at an employee or threatening to fire an employee."[29]

Marin cites Division Two's recent decision in Boyd v. State[30] to contend that the treatment he received, taken together, amounted to an adverse employment action. In that case, Boyd showed that his employer, a state hospital, suspended him for two weeks without pay, gave him a written reprimand and sent it to his supervisor along with a list of threatening comments he allegedly made, removed him from his ward and patient interaction, and reported him to the Department of Health and the police.[31] The hospital argued that as a matter of law, some of these acts were not adverse. The court disagreed,

---

[26] RCW 49.60.210(1); Currier v. Northland Servs., Inc., 182 Wn. App. 733, 742, 332 P.3d 1006 (2014), review denied, 182 Wn.2d 1006 (2015).

[27] Currier, 182 Wn. App. at 743.

[28] Kirby, 124 Wn. App. at 465 (internal quotation marks omitted) (quoting DeGuiseppe v. Vill. of Bellwood, 68 F.3d 187, 192 (7th Cir.1995)).

[29] Kirby, 124 Wn. App. at 465.

[30] 187 Wn. App. 1, 13-14, 349 P.3d 864 (2015).

[31] Boyd, 187 Wn. App. at 14.

stating, "We express no opinion as to whether these employment actions, taken individually, constituted adverse employment actions as a matter of law. However, taken in context, a reasonable jury could find that these actions, taken together, were materially adverse."[32]

Marin's reliance on Boyd is misplaced. That decision did not dispense with the requirement that a plaintiff must present sufficient evidence to survive summary judgment. Marin ignores the differences between his evidence and that of the plaintiff's in Boyd. In contrast to the hospital in Boyd, the County never suspended Marin without pay; it never reported him to the police or other authorities. Only in the context of these concededly adverse actions did Division Two find that a jury could conclude that the hospital's other actions were adverse.[33] Here, Marin presented no such context for his claims.

Second, Marin failed to show that his protected activity caused or was a "substantial factor" in the County taking any of the alleged adverse employment actions. He again compares his case to Boyd, where Division Two found a triable issue as to causation, but we again distinguish that case.[34] After Boyd told his supervisor to stop harassing him, "she became hostile and threatened to 'make sure [he] can't work in any of the 50 states.'"[35] She then "involved herself

---

[32] Boyd, 187 Wn. App. at 14.
[33] Boyd, 187 Wn. App. at 14.
[34] Boyd, 187 Wn. App. at 14.
[35] Boyd, 187 Wn. App. at 18 (alteration in original).

in investigating" a complaint that had been made against Boyd, collecting witness statements and interviews, and writing that Boyd "is known to lie."[36]  Their employer relied on her statements to discipline Boyd.[37]  Here, Marin points to Sagnis's statements to an HR person showing "retaliatory animus."  But unlike the supervisor in Boyd, Sagnis had no involvement with Marin after Marin made his complaint.  Sagnis made the statements months after Marin left his crew, and Marin acknowledges he did not know of the statements when he decided to remain at South Plant.  Because Marin cannot connect Sagnis's animus with any alleged action against him, he cannot use it to show causation.

Third, Marin failed to show that anyone at South Plant knew about his protected activity at West Point, precluding his claim that employees at South Plant retaliated for that activity.  He identifies no evidence that supports his bare assertion that the entire "chain of command" knew he complained against Sagnis.

Finally, as with his disparate treatment claim, Marin failed to show any evidence of pretext for retaliation.  He again points to the TLC he received on B Crew.  But as discussed above, the record does not show that the TLC was an adverse employment action or "adverse compared to other use of 'TLC' notes to

---

[36] Boyd, 187 Wn. App. at 18.
[37] Boyd, 187 Wn. App. at 18.

employees" in similar situations. The TLC does not support Marin's pretext argument.

Thus, Marin failed to satisfy his burden to show an adverse employment action, causation, and pretext to support either his discrimination or retaliation theory. The trial court did not err in dismissing his disparate treatment claim on summary judgment.

Evidentiary Rulings

The trial court ruled that Marin could not offer evidence that any coworker retaliated against him without first laying the foundation that the coworker was aware of Marin's discrimination complaint. Marin's coworkers needed this knowledge for their acts to be retaliatory under WLAD.[38]

Marin makes one challenge to this ruling: it restricted him to using direct and not circumstantial evidence that the alleged retaliator knew he had made a protected complaint. But the trial court's order did no such thing.[39] The order does not impose this restriction. Nothing in the record shows that the trial court would exclude circumstantial evidence of a coworker's knowledge.

---

[38] Currier, 182 Wn. App. at 746-47.
[39] The order required Marin to "lay[ ] an adequate foundation . . . showing that the accused coworker was aware that [Marin] had made a complaint about discrimination."

Marin also claims the trial court erred in striking coworker Lloyd Holman's testimony that he heard statements from unidentified coworkers that Marin had complained against his C Crew supervisor, Alenduff.

The trial court may condition admission of a party's evidence on the party's later introduction of facts necessary to make that evidence relevant.[40] After eliciting Holman's testimony, Marin offered no evidence that any alleged harasser had heard that he complained against Alenduff, let alone that they knew his complaint related to sexual harassment. The trial court did not abuse its discretion in finding such evidence necessary to make Holman's testimony relevant.

Jury Selection Issues

Marin next claims that the trial court failed to fully question and excuse juror 71, improperly reduced Marin's voir dire time, and improperly subtracted from Marin's trial time for a for-cause challenge.

The trial court has discretion to grant or deny a for-cause challenge.[41] That "discretion includes assuring that an impartial jury is selected 'with reasonable expedition.'"[42] When "the course of proceeding is not specifically

---

[40] ER 104(b).
[41] State v. Wilson, 141 Wn. App. 597, 606, 171 P.3d 501 (2007).
[42] State v. Brady, 116 Wn. App. 143, 147, 64 P.3d 1258 (2003) (quoting State v. Frederiksen, 40 Wn. App. 749, 753, 700 P.2d 369 (1985)).

pointed out by statute," the trial court may adopt "any suitable process or mode of proceeding . . . which may appear most conformable to the spirit of the laws."[43]

"[A] party accepting a juror without exercising its available challenges cannot later challenge that juror's inclusion."[44] But where a juror's misconduct prevents a party from learning of the juror's bias, the party does not waive its right to challenge him by failing to question him during voir dire.[45]

The County contends the jury's unanimity makes Marin's objections about juror 71 irrelevant. We need not decide this question because the trial court did not abuse its discretion in handling the jury issues before it.

First, Marin waived his for-cause challenge by not raising it during voir dire.[46] The exception to the waiver rule does not apply because juror 71 did not prevent Marin from learning of his potential bias by misconduct.[47] He disclosed on his questionnaire that he was "[g]ood friend[s] with a King County prosecutor." He responded to a pertinent general question about this topic during voir dire by

---

[43] RCW 2.28.150.

[44] Dean v. Grp. Health Coop. of Puget Sound, 62 Wn. App. 829, 836, 816 P.2d 757 (1991).

[45] In re Det. of Broten, 130 Wn. App. 326, 337, 122 P.3d 942 (2005).

[46] See Dean, 62 Wn. App. at 836.

[47] See Broten, 130 Wn. App. at 338. Juror misconduct is a fact question within the trial court's discretion. Dean, 62 Wn. App. at 837. To show misconduct, "a party must prove (1) that 'a juror failed to answer honestly a material question on voir dire' and (2) that 'a correct response would have provided a valid basis for a challenge for cause.'" Broten, 130 Wn. App. at 337 (emphasis omitted) (quoting McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 556, 104 S. Ct. 845, 78 L. Ed. 2d 663 (1984)).

raising his card. Marin did not question him or attempt to strike him from the jury before the panel was sworn. Marin did question him after the panel was sworn, and juror 71 indicated again that he was a friend of a woman in the county prosecutor's office. Marin did not ask juror 71 whether he thought that friendship would affect his ability to judge the case fairly. The record shows the trial court ensured Marin had "reasonable time to discover any prejudices."

Second, the record does not support Marin's contention that the trial court "reduced the allotted voir dire time." Marin initially used his allotted 30 minutes. And after juror 71 e-mailed the court, reraising his issue, the trial court granted Marin additional time. The court's decision to count that additional time against Marin's trial time was within its discretion to manage the courtroom and ensure impartial jury selection "'with reasonable expedition.'"[48]

Finally, Marin established no grounds for cause for dismissing juror 71 at the end of trial. Marin does not address the elements of a for-cause challenge, and Marin's questioning did not establish juror 71's inability to judge the case fairly.

Admission of McClung Testimony

Marin also challenges the trial court's admission of Dr. McClung's testimony.

---

[48] Brady, 116 Wn. App. at 146-47 (quoting Frederiksen, 40 Wn. App. at 753).

To bring a claim for failure to accommodate, Marin had to show he had a medical condition "that substantially limited his . . . ability to perform the job."[49] He also needed to show he was "qualified to perform the essential functions of the job."[50] Qualified expert testimony is admissible where it "will assist the trier of fact to understand the evidence or to determine a fact in issue."[51] And if one party opens the door, the court may admit "'evidence on the same issue to rebut any <u>false</u> impression that might have resulted.'"[52]

Here, the trial court excluded testimony about Marin's credibility and instructed the jury to disregard any that came close.[53] McClung's testimony did not relate to Marin's credibility but to his medical conditions, whether the County could reasonably accommodate them, and whether Marin could perform the essential functions of his job. Marin's accommodations claim put all of these matters at issue. Consequently, McClung's testimony was not impermissible

---

[49] <u>Riehl v. Foodmaker, Inc.</u>, 152 Wn.2d 138, 145, 94 P.3d 930 (2004) (quoting <u>Hill v. BCTI Income Fund-I</u>, 144 Wn.2d 172, 193, 23 P.3d 440 (2001)).

[50] <u>Davis v. Microsoft Corp.</u>, 149 Wn.2d 521, 532, 70 P.3d 126 (2003) (emphasis omitted) (quoting <u>Hill</u>, 144 Wn.2d at 193).

[51] ER 702.

[52] <u>United States v. Sine</u>, 493 F.3d 1021, 1037 (9th Cir. 2007) (quoting <u>United States v. Whitworth</u>, 856 F.2d 1268, 1285 (9th Cir. 1998)); <u>State v. Fisher</u>, 165 Wn.2d 727, 750, 202 P.3d 937 (2009).

[53] The court instructed the jury to disregard testimony that "under stress Mr. Marin might have difficulties with an accurate perception of reality." Instructions can cure errors in admitting testimony. <u>State v. Perez-Valdez</u>, 172 Wn.2d 808, 818-19, 265 P.3d 853 (2011).

character evidence under ER 404.[54] And since McClung's testimony was highly probative as to Marin's medical conditions, the trial court did not abuse its discretion in not excluding it under ER 403.

Moreover, Marin opened the door to testimony about the accuracy of his perceptions. His physicians testified that they wrote to the County requesting accommodations for PTSD, endorsed his belief that his condition flared due to stress at work, and even opined on his character. When cross-examining Dr. McClung, Marin repeatedly asked whether certain perceptions were "spot-on." Only then, on redirect, did the County clarify with McClung that Marin's perceptions were not all "spot-on."

Finally, Marin waived any objection under ER 702 that a paranoid-traits diagnosis is not a "recognized" diagnosis, making any testimony about it inadmissible. Although he hints at this argument, Marin does not argue the elements of the test for admissibility under Frye v. United States[55] or cite to authority. Also, he did not object to McClung's testimony on this basis at trial.

---

[54] Cf. In re Meistrell, 47 Wn. App. 100, 109, 733 P.2d 1004 (1987) (holding that ER 404 does not exclude prior mental history as character evidence).

[55] 293 F. 1013 (D.C. Cir. 1923); see Anderson v. Akzo Nobel Coatings, Inc., 172 Wn.2d 593, 603, 260 P.3d 857 (2011) (applying Frye test in Washington).

Thus, he did not preserve the issue for appeal.[56] McClung's testimony was admissible both on the merits and to rebut Marin's witnesses.

<u>Directed Verdict on Retaliation Aspect of Hostile Work Environment Claim</u>

Marin contends the trial court erred by dismissing Marin's claim of hostile work environment based on retaliation. We review a ruling on a motion for directed verdict under the same standard as the trial court, affirming the directed verdict when "'there is no substantial evidence or reasonable inference to sustain a verdict for the nonmoving party.'"[57]

To show retaliation based on protected activity, a plaintiff must provide evidence that the individuals he alleges retaliated against him knew of his protected activity.[58] The WLAD does not prohibit an employer's actions without evidence of a causal link between the action and a plaintiff's protected activity.[59]

The trial court dismissed Marin's claim of retaliation-based hostile work environment because it determined that Marin presented no evidence that anyone harassed him after knowing about his protected activity. The record supports that finding: Marin did not work with Sagnis after complaining against

[56] See <u>Johnston-Forbes v. Matsunaga</u>, 181 Wn.2d 346, 356, 333 P.3d 388 (2014).

[57] <u>Guijosa v. Wal-Mart Stores, Inc.</u>, 144 Wn.2d 907, 915, 32 P.3d 250 (2001) (quoting <u>Sing v. John L. Scott, Inc.</u>, 134 Wn.2d 24, 29, 948 P.2d 816 (1997)).

[58] See <u>Currier</u>, 182 Wn. App. at 746-47.

[59] <u>Alonso v. Qwest Commc'ns Co.</u>, 178 Wn. App. 734, 753-54, 315 P.3d 610 (2013).

him, so Sagnis's later comments were not retaliatory. No one at South Plant knew of Marin's complaint against Sagnis or any other protected activity, so whatever conduct Marin experienced at South Plant could not have been retaliation for that complaint. And after Marin then complained about Alenduff, the County respected his request to remain anonymous. Marin presented no evidence of any conduct by a managing employee who was aware of Marin's complaints that a reasonable juror could find to be harassment. Instead, he alleges, "HR terrified [him] . . . that he would return to Sagnis's" crew "and that he was 'welcome to go back to West Point D Crew.'" He bases these allegations on the County offering him a choice of remaining at South Plant or returning to West Point. No reasonable juror could interpret those offers to accommodate Marin as harassment, so HR's knowledge of Marin's protected activity cannot be the basis of a retaliation claim.

Thus, contrary to Marin's assertion that he provided "evidence of widespread notice of protected WLAD activity," Marin's evidence was not sufficient for any rational juror to find retaliatory animus. Nowhere does he point to an individual who both knew of his protected activity and, afterward, took some action that could reasonably be construed as harassment. The trial court therefore correctly directed a verdict for the County on Marin's claim of hostile work environment based on retaliation.

Remaining Assignments of Error

Marin asserts that the trial court erred in denying his motions alleging discovery violations by the County. He fails to support these assignments of error with argument and citations to authority and has thus waived them.[60] And so far as his arguments are discernible, they lack merit. Marin cites to no evidence that exhibits 618 and 619—summary exhibits of large spreadsheets containing Marin's time entries—should have been produced in response to discovery but were not, and he does not explain how late discovery of those exhibits prejudiced him.[61] Marin's arguments that the County failed to disclose exhibits 458, 629, and 630—e-mails and logs regarding the April 2009 "priority directive" at West Point—similarly lack support.[62]

---

[60] An appellant's briefs must present "argument in support of the issues presented for review, together with citations to legal authority and references to relevant parts of the record." RAP 10.3(a)(6). "Unsubstantiated assignments of error are deemed abandoned." Kittitas County v. Kittitas County Conserv. Coal., 176 Wn. App. 38, 54, 308 P.3d 745 (2013).

[61] See Colley v. Peacehealth, 177 Wn. App. 717, 727, 312 P.3d 989 (2013) (holding that error in admitting evidence on collateral issue did not require reversal).

[62] The County did produce exhibit 458 in discovery, contrary to Marin's statement. And it did not offer exhibits 629 or 630 into evidence. The trial court invited Marin to submit briefing on those exhibits' admissibility, but Marin never did so.

Marin also waived his claim that the trial court's imposition of costs was unauthorized. His only argument—that "[s]tatute[s] authorized few of the costs"—is too vague to permit review.[63]

Marin assigns error to several other trial court actions. But he fails to support these claims too, effectively waiving them.

## CONCLUSION

Because Marin failed to present evidence sufficient to create a genuine issue of material fact as to every element of a disparate treatment claim and because Marin's numerous other arguments also lack merit, we affirm.

_Leach, J._

WE CONCUR:

_____     _____

---

[63] See RAP 10.3(a)(6); Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).