# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| LARRY CURRIER, individually; LARRY CURRIER, DBA AMERICAN CONTAINER EXPRESS, as sole proprietor and agent; and AMERICAN CONTAINER EXPRESS, INC., a Washington corporation, | NO. 70128-2-I |
| | DIVISION ONE |
| Respondent, | PUBLISHED OPINION |
| v. | |
| NORTHLAND SERVICES, INC., a Washington corporation, | FILED: August 4, 2014 |
| Appellant, | |
| JUDI McQUADE, in her individual capacity; JAMES "JIM" SLEETH, in his individual capacity; PATRICK FRANSSEN, in his individual capacity; and LARRY GRAHAM, in his individual capacity, | |
| Defendants. | |

LEACH, J. — Northland Services Inc. (NSI) appeals a trial court decision holding NSI liable for the retaliatory discharge of independent contractor Larry Currier, dba American Container Express, under the Washington Law Against Discrimination (WLAD), chapter 49.60 RCW. NSI terminated Currier's contract two days after Currier reported to an NSI employee racially discriminatory comments directed at a Latino driver by another contractor driver. Because the WLAD applies to this case and substantial evidence supports the trial court's

findings and conclusions that retaliation was a substantial factor in NSI's termination of Currier, we affirm the trial court's judgment. And because substantial evidence supports the trial court's damages award as well as its finding that NSI did not meet its burden of proof for an after-acquired evidence defense, we also affirm the court's award of damages, costs, and attorney fees. Finally, we award Currier, as the prevailing party, his appellate fees and costs under RAP 18.1 and RCW 49.60.030(2).

## FACTS

Larry Currier worked as an independent contractor truck driver for NSI from 2005 until August 14, 2008. Their subcontractor agreement required Currier to comply with all local, state, and federal laws. Either party could terminate the agreement on 30 days' notice or immediately upon default.

Yard supervisor Tom Vires advised Currier to install a citizens band (CB) radio in his truck to facilitate communication with NSI dispatchers and forklift operators. Currier told Vires he hated and did not want to hear the "obscene" racist and sexist speech routinely heard on CB, including over the company's radio frequency.[1] Later, at Vires's request, Currier installed a radio.

Around 2007, Currier heard Jim Sleeth, a contractor driver who later became an NSI dispatcher, say in the terminal, "Let's go put on the white sheets and scare Fred!" Fred Morris was an African American driver for NSI.[2] In 2008,

---

[1] Vires testified that Currier referred to "obscene" or "explicit" speech but that he did not remember Currier referencing sexist or racist speech.

[2] Sleeth denied making this statement.

Currier witnessed driver Terry Mock verbally abuse two Latino drivers named Victor and Julio: "Hey, f**ing Mexicans, what do you got for sale? I know you got something for sale because all Mexicans are thieves." Currier did not report either of these incidents.

In spring or summer 2008, Currier had a confrontation in the receiving office with Billy Howell, another driver. Howell whispered to Currier, "Hey, f**ing N** lover, you're just a piece of s**t. You're ripping these people off here by not working hard enough." Currier became angry, and a loud argument followed.

On August 12, 2008, Currier heard Howell yell across the yard to a Latino driver, Marco Martinez, "Hey, f**ing Mexican, you know why you have to go to Portland and I don't? Because f**ing Mexicans are good at crossing borders." Currier was upset and reported Howell's comment to Judith McQuade, NSI quality assurance manager. He did not report it to dispatch because he believed dispatch was involved. McQuade immediately reported the incident to dispatcher Sleeth and reported it to dispatcher Patrick Franssen the next day.

On August 14, 2008, Sleeth and Franssen met with Larry Graham, NSI terminal operations manager, for guidance on how to terminate Currier's contract. Graham told Sleeth and Franssen that because Currier was a contractor and not an employee, they "could just terminate the contract if he was not performing," and recommended they do so. Sleeth and Franssen did not tell

Graham about the August 12 incident or Currier's complaint, which Graham only learned of "much later."[3]

On August 14, 2008, Sleeth and Franssen called Currier into a meeting room and told him they would no longer be using his services—that "the reasons were for his customer service issues that we had with him. Us—customer being Northland Services, Patrick and I."[4] They also told him that they had talked with McQuade and the drivers and that "they had decided that the joke was funny."

After the termination of his contract, Currier left his truck in NSI's freight yard. When Sleeth walked by Currier's truck, he noticed several bald tires and expired license tags. He took photos of the truck.

In 2009, Currier filed a complaint with the Seattle Office of Civil Rights, which conducted an investigation. In 2011, Currier commenced suit against NSI for retaliation under the WLAD, RCW 49.60.210 and .030.

NSI moved for summary judgment, arguing that "the Washington Law Against Discrimination (WLAD) simply does not apply to alleged discrimination solely between two independent contractors, therefore there can be no retaliation as a matter of law and plaintiffs' case should be dismissed." The court denied NSI's motion, and a bench trial followed. On February 21, 2013, the court entered findings of fact and conclusions of law that held NSI liable for retaliation

---

[3] Graham testified on cross-examination that if Franssen and Sleeth had told him about the incident and said, "[A]nd because of that, we've had enough of Currier and we want to fire him," Graham would not have advised termination because "the issue is not Currier, it's Billy Howell."

[4] This also terminated the contract and any relationship between NSI and Currier, dba American Container Express Inc..

within the meaning of RCW 49.60.210. The court awarded Currier economic loss damages of $301,604.00, noneconomic damages of $25,000.00, attorney fees of $265,500.00, and costs of $8,864.69.

NSI appeals.[5]

## STANDARD OF REVIEW

This court reviews a trial court's findings and conclusions to determine if substantial evidence supports them and if those findings support the court's conclusions of law.[6] Substantial evidence is evidence sufficient to persuade a fair-minded, rational person of the truth of the matter asserted.[7] The trial court is in a better position to make credibility determinations, and if substantial evidence exists, this court will not substitute its judgment for that of the trial court on appeal.[8]

---

[5] Though NSI's notice of appeal to this court lists five orders, NSI only assigns error to and argues four: the court's denial of NSI's motion for summary judgment, judgment, findings and conclusions on liability, and findings and conclusions on damages. NSI appears to have abandoned its appeal of the court's order denying NSI's motions to dismiss Currier's first amended and original complaints, and we decline to review it. An issue not briefed is deemed waived. Kadoranian v. Bellingham Police Dep't, 119 Wn.2d 178, 191, 829 P.2d 1061 (1992). And because we conclude that Currier established a prima facie case of retaliation, we do not address NSI's appeal of the trial court's denial of summary judgment.

[6] State v. Ross, 106 Wn. App. 876, 880, 26 P.3d 298 (2001).

[7] State v. Levy, 156 Wn.2d 709, 733, 132 P.3d 1076 (2006).

[8] Fisher Props., Inc. v. Arden-Mayfair, Inc., 115 Wn.2d 364, 369-70, 798 P.2d 799 (1990).

ANALYSIS

RCW 49.60.030 and .210

The Washington Supreme Court has repeatedly said that the WLAD expresses a "'public policy of the highest priority.'"[9] The legislature enacted the WLAD to eliminate and prevent discrimination in Washington.[10] The legislature has directed that the provisions of the WLAD "shall be construed liberally for the accomplishment of the purposes thereof."[11]

RCW 49.60.030 is entitled "Freedom from discrimination—Declaration of civil rights" and states in relevant part,

> (1) The right to be free from discrimination because of race, creed, color, national origin, sex, honorably discharged veteran or military status, sexual orientation, or the presence of any sensory, mental, or physical disability or the use of a trained dog guide or service animal by a person with a disability is recognized as and declared to be a civil right. This right shall include, but not be limited to:
> (a) The right to obtain and hold employment without discrimination.

The WLAD also extends broad protections to "any person" engaging in statutorily protected activity from retaliation by an employer or "other person." RCW 49.60.210(1) provides,

> (1) It is an unfair practice for any employer, employment agency, labor union, or other person to discharge, expel, or otherwise discriminate against any person because he or she has opposed any practices forbidden by this chapter, or because he or she has

---

[9] Int'l Union of Operating Eng'rs, AFL-CIO, Local 286 v. Port of Seattle, 176 Wn.2d 712, 722, 295 P.3d 736 (2013) (internal quotation marks omitted) (quoting Antonius v. King County, 153 Wn.2d 256, 267-68, 103 P.3d 729 (2004)).
[10] RCW 49.60.010.
[11] RCW 49.60.020.

filed a charge, testified, or assisted in any proceeding under this chapter.

To establish a prima facie case of retaliation under RCW 49.60.210(1), a plaintiff must show that (1) he or she engaged in statutorily protected activity, (2) he or she suffered an adverse employment action, and (3) there was a causal link between his or her activity and the other person's adverse action.[12] The first element describes opposition to "any practices forbidden by" RCW 49.60.[13] When a person reasonably believes he or she is opposing discriminatory practices, RCW 49.60.210(1) protects that person whether or not the practice is actually discriminatory.[14] A plaintiff proves causation by showing that retaliation was a substantial factor motivating the adverse employment action.[15] If the plaintiff establishes a prima facie case, then the defendant may rebut the claim by presenting evidence of a legitimate nondiscriminatory reason for the adverse action.[16] This shifts the burden back to the plaintiff to prove that the employer's reason is pretextual.[17] The trier of fact must then "choose between inferences

---

[12] Estevez v. Faculty Club of the Univ. of Wash., 129 Wn. App. 774, 797, 120 P.3d 579 (2005).

[13] Coville v. Cobarc Servs., Inc., 73 Wn. App. 433, 440, 869 P.2d 1103 (1994).

[14] Ellis v. City of Seattle, 142 Wn.2d 450, 460-61, 13 P.3d 1065 (2000); Graves v. Dep't of Game, 76 Wn. App. 705, 712, 887 P.2d 424 (1994) (citing Gifford v. Atchison, Topeka & Santa Fe Ry., 685 F.2d 1149, 1157 (9th Cir. 1982)).

[15] Allison v. Hous. Auth., 118 Wn.2d 79, 96, 821 P.2d 34 (1991).

[16] Wilmot v. Kaiser Aluminum & Chem. Corp., 118 Wn.2d 46, 70, 821 P.2d 18 (1991); Estevez, 129 Wn. App. at 797-98; Kahn v. Salerno, 90 Wn. App. 110, 129 n.5, 951 P.2d 321 (1998).

[17] Wilmot, 118 Wn.2d at 70; Estevez, 129 Wn. App. at 798; Kahn, 90 Wn. App. at 129 n.5.

when the record contains reasonable but competing inferences of both discriminatory and nondiscriminatory actions."[18]

### Currier's Prima Facie Case for Retaliation

#### Statutorily Protected Activity

NSI contends that Currier may not bring this action for two reasons: (1) as an independent contractor, he is not an "employee" within the meaning of the statute and (2) because he did not oppose a specific employment practice of his employer, he did not engage in statutorily protected activity. Therefore, Currier cannot assert a claim for retaliation under RCW 49.60.210(1), and the trial court erred in denying NSI's motion for summary judgment.

To show that chapter 49.60 RCW does not protect an independent contractor, NSI notes that WAC 162-16-230, a rule promulgated by the Washington Human Rights Commission, excludes independent contractors from the protections of RCW 49.60.180.[19] This rule, however, provides only that independent contractors may not enforce the civil right guaranteed in RCW 49.60.030(1) by actions of the Washington Human Rights Commission. It does not prevent independent contractors from enforcing the broad protections of

---

[18] Burchfiel v. Boeing Corp., 149 Wn. App. 468, 483, 205 P.3d 145 (2009) (citing Hill v. BCTI Income Fund-I, 144 Wn.2d 172, 186, 23 P.3d 440 (2001), overruled on other grounds by McClarty v. Totem Elec., 157 Wn.2d 214, 137 P.3d 844 (2006)).

[19] "**Purpose of section.** RCW 49.60.180 defines unfair practices in employment. A person who works or seeks work as an independent contractor, rather than as an employee, is not entitled to the protections of RCW 49.60.180." WAC 162-16-230(1).

RCW 49.60.030(1) by private lawsuit.[20] And in Marquis v. City of Spokane,[21] the Washington Supreme Court held that "under the broad protections of RCW 49.60.030, an independent contractor may bring an action for discrimination in the making or performance of contract for personal services where the alleged discrimination is based on sex, race, creed, color, national origin or disability." The broad language of RCW 49.60.210(1) likewise supports the conclusion that the WLAD does not limit claims to those brought by employees against employers.[22] We hold that RCW 49.60.030 and .210(1) protect Currier as an independent contractor.

NSI next argues that because the racially derogatory statement came from Howell, an independent contractor, it cannot be imputed to NSI. Therefore Currier did not oppose a specific employment practice of NSI, and WLAD does not protect his objection to the statement.

NSI relies on certain federal cases including Silver v. KCA, Inc.,[23] in which the Ninth Circuit held that a plaintiff could not maintain a retaliation claim under Title VII of the Civil Rights Act of 1964[24] because she was opposing a racially

---

[20] **Rights of independent contractors.** While an independent contractor does not have the protection of RCW 49.60.180, the contractor is protected by RCW 49.60.030(1). The general civil right defined in RCW 49.60.030(1) is enforceable by private lawsuit in court under RCW 49.60.030(2) but not by actions of the Washington state human rights commission. WAC 162-16-230(2).

[21] 130 Wn.2d 97, 100-01, 112-13, 922 P.2d 43 (1996); see also Galbraith v. TAPCO Credit Union, 88 Wn. App. 939, 949-50, 946 P.2d 1242 (1997).

[22] Galbraith, 88 Wn. App. at 951.

[23] 586 F.2d 138, 140-41 (9th Cir.1978).

[24] 42 U.S.C. § 200e-3(a).

discriminatory act not of her employer but of a co-worker. That court held, "The opposition must be directed at an unlawful employment practice of an employer, not an act of discrimination by a private individual."[25]

Since the Ninth Circuit decided Silver in 1978, however, it has clarified that a plaintiff need not prove that the employment practice at issue was in fact unlawful but must show only a "reasonable belief" that the employment practice he or she protested was prohibited under Title VII.[26] Other Ninth Circuit cases have held that an employee's complaints about the treatment of others "is considered a protected activity, even if the employee is not a member of the class that he claims suffered from discrimination, and even if the discrimination he complained about was not legally cognizable."[27] The reasonableness of a plaintiff's belief is "an objective standard—one that makes due allowance, moreover, for the limited knowledge possessed by most Title VII plaintiffs about the factual and legal bases of their claims."[28] Washington cases have likewise

---

[25] Silver, 586 F.2d at 141; see also Little v. United Techs., Carrier Transicold Div., 103 F.3d 956, 959-60 (11th Cir. 1997) ("Based on the facts of this case, we conclude that Wilmot's racially offensive comment alone is not attributable to Carrier and, accordingly, Little's opposition to the remark did not constitute opposition to an unlawful employment practice.").

[26] Trent v. Valley Elec. Ass'n, 41 F.3d 524, 526 (9th Cir. 1994) (concluding that plaintiff's reasonable belief that it was unlawful for her to be subjected to a series of sexually offensive remarks at a seminar her employer required her to attend would support a finding that she engaged in "protected activity" for purposes of a prima facie case of retaliatory discharge).

[27] Ray v Henderson, 217 F.3d 1234, 1240 n.3 (9th Cir. 2000); see also Moyo v. Gomez, 40 F.3d 982, 985 (9th Cir. 1994) (finding black prison guard's belief that inmates were entitled to Title VII protection reasonable).

[28] Moyo, 40 F.3d at 985. The Moyo court also noted that "it has been long established that Title VII, as remedial legislation, is construed broadly." 40 F.3d at 985.

held that a plaintiff need not prove the conduct opposed was in fact discriminatory but need show only that he or she reasonably believed it was discriminatory.[29]

RCW 49.60.030(1)(a) guarantees "[t]he right to obtain and hold employment without discrimination." The trial court found that Currier reasonably believed that a white driver telling a Latino driver, on the job, that "f**ing Mexicans are good at crossing borders" was a discriminatory practice and that he opposed this practice by reporting it to an NSI employee. Substantial evidence supports the trial court's findings, and these findings support the court's conclusion that Currier was engaging in statutorily protected conduct.

Causal Link

The final element of a prima facie case of retaliation requires proof of a causal link between the opposition and the adverse employment action. To prove a causal link between his opposition and NSI's termination of his contract, Currier must provide evidence that his complaints about Howell's remarks were a "substantial factor" motivating NSI's decision.[30] Thus, retaliation need not be the main reason behind the discharge decision but instead need only be the reason which "tips the scales" toward termination.[31]

---

[29] Estevez, 129 Wn. App. at 798; Kahn, 90 Wn. App. at 130; Graves, 76 Wn. App. at 712 (citing Gifford, 685 F.2d at 1157).
[30] Allison, 118 Wn.2d at 96; Estevez, 129 Wn. App. at 800.
[31] Wilmot, 118 Wn.2d at 72.

-11-

"'Because employers rarely will reveal they are motivated by retaliation, plaintiffs ordinarily must resort to circumstantial evidence to demonstrate retaliatory purpose.'"[32] Proximity in time between the protected activity and the discharge, as well as satisfactory work performance and evaluations before the discharge, are both factors suggesting retaliation.[33] And if an employee establishes that he or she participated in statutorily protected opposition activity, the employer knew about the opposition activity, and the employee was then discharged, a rebuttable presumption of retaliation arises that precludes summary dismissal of the case.[34]

NSI maintains that it terminated Currier's contract because of poor performance and disruptive behavior. According to Sleeth and Franssen, Currier's performance declined in 2008. At trial, they testified that Currier performed more slowly than other drivers, avoided work, and instigated conflicts with other drivers. They claimed that customers complained about Currier. According to Sleeth, he and Franssen met with Currier soon after his quarrel with Howell to "put him on notice, just tell him that we have some major issues with his overall demeanor, the way he treats the other drivers, the way he performs his job, his efficiency issues, his unpredictability. He seemed to anger very easily over very small things." Currier denied that this meeting took place and denied

---

[32] Estevez, 129 Wn. App. at 799 (quoting Vasquez v. State, 94 Wn. App. 976, 985, 974 P.2d 348 (1999)).

[33] Wilmot, 118 Wn.2d at 69; Estevez, 129 Wn. App. at 799; Vasquez, 94 Wn. App. at 985, Kahn, 90 Wn. App. at 130-31.

[34] Estevez, 129 Wn. App. at 799; Vasquez, 94 Wn. App. at 985; Kahn, 90 Wn. App. at 131; Graves, 76 Wn. App. at 712.

that Sleeth and Franssen ever spoke to him about agitating other drivers, his temper, customer complaints, or slow performance.

NSI produced no documentation of complaints about Currier's performance. No driver or customer who reportedly complained to Sleeth or Franssen testified at trial. NSI called one other driver to testify at trial. When questioned about Currier's work ethic, the driver testified that he believed Currier was doing "as good a job as me." The trial court noted that even Currier's status as an independent contractor does not explain the "total absence of any writings about the numerous problems to which the dispatchers testified."

The trial court found inconsistencies in the nonretaliatory bases Sleeth and Franssen provided for their termination of Currier's contract, as well as the timing of the termination decision. At trial, Sleeth and Franssen testified that they had made the decision to fire Currier at least a week before Currier's complaint and waited for their meeting with Larry Graham only to confirm their decision. In earlier answers to interrogatories, however, they made no mention of having already made this decision. Larry Graham testified at trial that Sleeth and Franssen cited Currier's slow performance and safety and compliance issues with his truck. Graham did not recall anything about Currier agitating other drivers or that there had been customer complaints. While Sleeth and Franssen testified that customer complaints were a reason for Currier's termination, they did not cite this reason in earlier interrogatory answers.

There were also inconsistencies among the accounts of McQuade, Sleeth, and Franssen about the meetings that occurred after Currier complained about Howell's racist remarks. McQuade testified that she reported Currier's complaint to Sleeth that day and to Franssen that day or the next. She testified that she, Sleeth, and possibly Franssen met with Howell and Martinez the day after Currier's complaint. Sleeth and Franssen, however, testified they did not meet with the drivers. Sleeth testified he did not speak to McQuade about the complaint and did not know about it before terminating Currier.

"Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive."[35] Here, the trial court found a lack of documentation for NSI's purported nondiscriminatory reasons for terminating Currier's contract. The court also found inconsistencies in Sleeth's and Franssen's explanations of those reasons and in their accounts of the events surrounding Currier's complaint. The court found a close proximity in time between the complaint and the termination. The court did "not find credible the claim that Plaintiff's [c]omplaint had no effect on the decision to terminate Plaintiff's contract." Substantial evidence supports the court's conclusion that Currier's complaint "tipped the scales toward termination."

---

[35] Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000).

NSI argues that the trial court's decision "would effectively hold an employer liable for all discriminatory statements of all of its independent contractors or sales and supply vendors that happen to be on the employer's property."[36] But this argument begins with a faulty premise—that NSI is being held liable for Billy Howell's racially discriminatory speech. This completely misrepresents the basis for liability. The trial court held NSI liable for its own retaliatory conduct against an independent contractor after he complained to NSI. The trial court's decision does not make the law "a general civility code" beyond the original intent of the legislature;[37] it holds NSI accountable for the exact type of retaliatory conduct the legislature sought to prevent with RCW 49.60.210(1). We affirm the trial court's finding of liability for retaliation.

Damages and NSI's After-Acquired Evidence Defense

RCW 49.60.030(2) provides remedies for a prevailing party, including recovery of actual damages, costs, and reasonable attorney fees. "Actual damages are 'a remedy for full compensatory damages, excluding only nominal, exemplary, or punitive damages,' that are 'proximately caused by the wrongful

---

[36] The Association of Washington Business filed an amicus curiae brief in support of this argument.

[37] See Alonso v. Qwest Communications Co., 178 Wn. App. 734, 747, 315 P.3d 610 (2013), and Adams v. Able Building Supply, Inc., 114 Wn. App. 291, 297, 57 P.3d 280 (2002), for the proposition that "[t]he WLAD is not intended as a general civility code." These cases are distinguishable as involving disparate treatment or a hostile work environment, where the degree of abusive conduct by co-workers is the disputed fact. The issue in this case is not Howell's (undisputed) offensive behavior, which by itself would likely not support such a claim. Rather, the issue here is the alleged retaliatory conduct of NSI in response to Currier's complaint about it.

action, resulting directly from the violation of RCW 49.60.'"[38] A court may limit economic damages if the employer shows evidence of the employee's wrongdoing that it discovered only after the discharge.[39] Under this after-acquired evidence rule, an award for back pay is calculated from the date of the unlawful discharge to the date the employer discovered a lawful basis for discharge.[40] To establish an after-acquired evidence defense, an employer must prove that the wrongdoing was of such severity that had the employer discovered the misconduct earlier, it would have terminated the employee on those grounds alone.[41]

NSI assigns error to the trial court's conclusion that NSI failed to prove an after-acquired evidence defense. Sleeth and Franssen both testified at trial that had they not already terminated Currier's contract, they would have done so immediately upon discovering the condition of his truck. However, the trial court found that "NSI would not have learned of the condition of Plaintiff's truck had NSI not terminated his contract, because it was undisputed that NSI did not perform regular truck inspections." NSI's subcontractor agreement required contractor drivers to comply with all local, state, and federal laws and regulations, and thus Currier arguably breached his contract. But NSI did not show that its

[38] Blaney v. Int'l Ass'n of Machinists & Aerospace Workers, Dist. No. 160, 151 Wn.2d 203, 216, 87 P.3d 757 (2004) (citation omitted) (quoting Martini v. Boeing Co., 137 Wn.2d 357, 368, 371, 971 P.2d 45 (1999)).

[39] McKennon v. Nashville Banner Pub. Co., 513 U.S. 352, 362-63, 115 S. Ct. 879, 130 L. Ed. 2d 852 (1995); Janson v. N. Valley Hosp., 93 Wn. App. 892, 900-01, 971 P.2d 67 (1999).

[40] Janson, 93 Wn. App. at 900.

[41] Janson, 93 Wn. App. at 901 (citing McKennon, 513 U.S. at 362-63).

response would have been termination, especially given the lack of evidence that NSI had any policy to ensure its contractors' compliance.

NSI's tire expert, Dave Temple, testified that Sleeth's photographs showed "there was [a] violation of the Code of Federal Regulations." Temple also testified, however, that he could not determine from the photographs whether the tread on Currier's tires would require that the truck be placed out of service. Currier's operation of his truck with expired license tabs was a civil infraction subject to a citation. NSI presented no evidence that it ever terminated any driver's contract because of equipment or licensing issues or traffic infractions. The trial court did not find the testimony of Sleeth and Franssen credible.

This court will not disturb a damages award unless the award falls outside the range of substantial evidence in the record, shocks the conscience of the court, or appears to be the result of passion or prejudice.[42] And this court strongly presumes the trial court's verdict is correct.[43] Because substantial evidence supports the trial court's findings, we affirm the court's award of damages, attorney fees, and costs.

Appellate Costs and Attorney Fees

Currier requests attorney fees and costs on appeal. Under RAP 18.1 and RCW 49.60.030(2), the prevailing party is entitled to appellate fees and costs.[44]

---

[42] Bunch v. King County Dep't of Youth Servs., 155 Wn.2d 165, 179, 116 P.3d 381 (2005); Burchfiel, 149 Wn. App. at 484.
[43] Bunch, 155 Wn.2d at 179; Burchfiel, 149 Wn. App. at 484.
[44] Allison, 118 Wn.2d at 98.

We award Currier appellate costs and reasonable attorney fees, subject to his compliance with RAP 18.1(d).

CONCLUSION

Because substantial evidence supports the trial court's findings of fact regarding liability and damages and those findings support the court's conclusions of law, we affirm and award Currier his costs and reasonable attorney fees on appeal.

_Leach, J._

WE CONCUR:

_Appelwick_

_Becker, J._