IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| SHAW RAHMAN, | ) | No. 74879-3-I |
| | ) | |
| Appellant, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | |
| THE BOEING COMPANY, KARI | ) | |
| FOGELMAN, KRISTI PATTERSON, | ) | UNPUBLISHED OPINION |
| KIMBERLY YEATON, KIMBERLY | ) | |
| TRULSON, KEN NAETHE, ANDREW | ) | |
| WRIGHT, RUSS JONES, and LARRY | ) | |
| P. LITTLE, | ) | |
| | ) | |
| Respondents. | ) | FILED: October 17, 2016 |

SCHINDLER, J. — Mohammad (Shaw) Rahman filed a lawsuit against The Boeing

Company alleging race, religion, national origin discrimination, retaliation, and

harassment in violation of the Washington Law Against Discrimination, chapter 49.60

RCW. Rahman also alleged violation of the "Family Care Act," RCW 49.12.270 through

.295. We affirm summary judgment dismissal of his lawsuit.

FACTS

Mohammad (Shaw) Rahman is a South Asian United States citizen and a

member of the Islamic faith. On December 21, 2007, Rahman applied for a project

manager position with the Boeing 787 Support and Services Domain Team. Boeing

managers Kari Fogelman and Trina Goehring interviewed Rahman for the position.

Based on his resume and his response to the structured interview questions, Fogelman hired Rahman to work for her as a project manager with the 787 Parts Information Management Systems Group.

Rahman started work on February 22, 2008. As a project manager, Rahman was responsible for initiating, planning, supervising, and closing projects; scheduling project reviews; budget forecasting; project status reports; statement-of-work development; and coordinating project teams. Boeing project managers use Macroscope, a project management tool, to implement and translate engineering information into computer-based maintenance manuals for aircraft mechanics.

According to Fogelman, soon after Rahman began working as a project manager, "he was not performing as expected." Rahman "failed to complete work assignments." A number of Boeing employees told Fogelman that Rahman did not show up for scheduled meetings or provide team members with needed information that "adversely impacted the ability of those employees to complete their own Boeing job assignments."

On May 1, Fogelman and Information Technology Manager Kristi Patterson met with Rahman to discuss his attendance and job performance. Fogelman reviewed the attendance and employee expectations policies with Rahman. Rahman said he understood the rules and expectations and did not have any questions about the policies. Fogelman told Rahman that his failure to comply may lead to further corrective action including termination. Fogelman documented the May 1 meeting and the verbal warning.

On May 30, Fogelman and Engineering Project Lifecycle Manager Kimberly Yeaton met with Rahman about the continuing problems with his job performance and

attendance. Fogelman had prepared two written "Corrective Action Memos" (CAMs). The CAM that addressed Rahman's job performance states he "failed to follow management directions on numerous occasions regarding project management tasks and assignments" and "delegated tasks to others when directed to complete the tasks" himself. The other CAM addressed Rahman's attendance and his failure to contact Fogelman about absences in a timely manner. The CAMs state failure to comply with the written warning may be considered grounds for further corrective action "up to and including termination of employment."

As Fogelman read out loud the performance CAM, Rahman became "visibly agitated." When she handed Rahman the CAM for his signature, he refused to sign it. Rahman "threw the document, growing increasingly agitated and raising his voice," and accused Fogelman of lying about his performance. When Fogelman turned to the attendance CAM, Rahman became "more agitated and hostile," throwing a pen, pounding the table, and crinkling up the CAM before "throwing it at Ms. Fogelman." Rahman refused to sign the CAM. Rahman "stormed out of the room, and slammed the door." Rahman's actions "frightened and surprised" Fogelman and Yeaton.

On July 31, Rahman attended a "Corrective Action Session" with Program Manager Larry Little, Project Data Management Specialist Kendall Naethe, Human Resources Generalist Kimberly Trulson, and Fogelman. Fogelman suspended Rahman for five days without pay for continuing to disregard management directives, improperly delegating his work to others, and failing to timely notify her of his absences from work. Fogelman gave Rahman a performance improvement plan (PIP). The PIP stated his "job progress to date is unsatisfactory," he was "not acting as a lead project manager," and he was not completing his work as assigned. As Fogelman attempted to read the

3

PIP out loud, she was "interrupted by Mr. Rahman's angry outburst." Rahman "started yelling, stood up, became visually agitated," and called everyone in the room "liars." Despite attempts by Little and Naethe to calm him down, Rahman continued to behave in "erratic and intimidating ways." Rahman stood up, "flailed his arms, threw objects," and claimed he wanted to quit his job. Fogelman left the room to call Boeing Security.

When Fogelman returned, she attempted to finish reading the PIP. Rahman continued to yell and interrupt her even after Boeing Security arrived and instructed him to calm down. After Fogelman handed him the memo to sign, Rahman became "further agitate[d]" and refused to sign the memo. Boeing Security escorted Rahman out of the building.

On August 5, Boeing Human Resources sent Rahman a letter instructing him to contact Boeing Medical to set up an appointment for evaluation before he returned to work following the five-day suspension. The letter states, "Failure to set up this appointment constitutes insubordination and will result in your immediate termination."[1]

On August 12, 2008, Boeing sent Rahman a letter terminating his employment. The termination letter states, "You have failed to set up your appointment with [the Employee Assistance Program] as required to maintain your employment. This constitutes insubordination and has resulted in your termination effective August 8th, 2008."[2]

Representing himself pro se, Rahman filed a lawsuit against Boeing and Boeing employees on July 6, 2011. The lawsuit alleged racial, religious, national origin discrimination, retaliation, and harassment in violation of the Washington Law Against

---

[1] Boldface omitted.
[2] Boldface omitted.

4

Discrimination (WLAD), chapter 49.60 RCW. Rahman also alleged Boeing terminated him for using sick leave to care for relatives in violation of the Family Care Act, RCW 49.12.270 through .295.

Boeing filed a motion for summary judgment dismissal of the lawsuit. Boeing asserted legitimate nondiscriminatory reasons for terminating Rahman and argued there is no evidence of pretext, retaliation, hostile work environment, or that Rahman sought to use sick leave to care for relatives. Boeing submitted the declarations of Fogelman, Patterson, Yeaton, Little, Naethe, Trulson, and coworkers Russell Jones, Gerry Larson, Hilary Okrent-Grilley, and Andrew Wright.

In her declaration, Fogelman states Rahman "was not producing any usable work product (and was producing scant work product overall)" and "submitting claims for overtime pay without any evidence that he was producing anything of value at Boeing." Fogelman states Rahman "too frequently failed to report to work or to timely inform Boeing of his absences from work" and continued to improperly delegate his work to others after she warned him not to.

> Rahman's performance and attendance showed no improvement after five months on the job. Mr. Rahman continue to improperly report his attendance; continued to improperly delegate work to others; and continued to improperly challenge my authority to assign him work, all while failing to properly complete even a single assignment. This was the first time in my 20-plus years of Boeing employment that I had encountered an employee who so completely failed to produce and perform his job duties.

In opposition to summary judgment, Rahman filed a 57-page brief with approximately 900 pages of exhibits including e-mails, excerpts from depositions, declarations, interrogatories, requests for production, and work documents. Rahman annotated a number of the exhibits with comments.

The court granted summary judgment dismissal of the claims against Boeing and the Boeing employees. Rahman appeals.

ANALYSIS

Rahman contends the court erred in granting summary judgment dismissal of his lawsuit. We review summary judgment de novo. Citizens All. for Prop. Rights Legal Fund v. San Juan County, 184 Wn.2d 428, 435, 359 P.3d 753 (2015). We consider all facts and make all reasonable factual inferences in the light most favorable to the nonmoving party. Young v. Key Pharm., Inc., 112 Wn.2d 216, 226, 770 P.2d 182 (1989).

At summary judgment, the burden is on the moving party to show the absence of an issue of material fact. Young, 112 Wn.2d at 225. If the moving party satisfies its burden, the nonmoving party must present evidence showing there are genuine issues of material fact. Young, 112 Wn.2d at 225. An adverse party may not rest on mere allegations, but must set forth specific facts showing that there is a genuine issue for trial. CR 56(e). The facts required by CR 56(e) to defeat a summary judgment motion are evidentiary in nature. Grimwood v. Univ. of Puget Sound, Inc., 110 Wn.2d 355, 359, 753 P.2d 517 (1988). Speculation, assertions, opinions, and conclusory statements do not create a genuine issue of material fact. Grimwood, 110 Wn.2d at 359-60.

If the nonmoving party " 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial,' " then the court should grant summary judgment. Young, 112 Wn.2d at 225 (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). Although we are mindful that Rahman represents himself pro

se, we hold self-represented litigants to the same standards as attorneys. In re Marriage of Olson, 69 Wn. App. 621, 626, 850 P.2d 527 (1993).

Rahman claims Boeing terminated him because of his race, religion, and national origin in violation of WLAD. Under WLAD, an employer may not "discharge or bar any person from employment because of . . . race, creed, color, [or] national origin." RCW 49.60.180(2). An employer may not "discharge, expel, or otherwise discriminate against any person because he or she has opposed any practices forbidden by this chapter." RCW 49.60.210(1). An employer may not discriminate against any employee in the "terms or conditions of employment" because of "race, creed, color, [or] national origin." RCW 49.60.180(3).

We use the McDonnell Douglas burden-shifting framework to determine the order and nature of proof for summary judgment. Scrivener v. Clark Coll., 181 Wn.2d 439, 445, 334 P.3d 541 (2014); see also McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). Under the McDonnell Douglas burden-shifting framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination by showing he "(1) was within the protected group; (2) was discharged; (3) was replaced by a person outside the protected group; and (4) was qualified to do the job." Kastanis v. Educ. Emps. Credit Union, 122 Wn.2d 483, 490, 859 P.2d 26 (1993); Scrivener, 181 Wn.2d at 446.

If the plaintiff meets his burden of establishing a prima facie case of discrimination, the burden of production shifts to the defendant to "articulate a legitimate, nondiscriminatory reason" for the termination. Scrivener, 181 Wn.2d at 446. If the defendant meets this burden, the burden shifts back to the plaintiff to show the defendant's articulated reason is a "pretext for a discriminatory purpose." Scrivener,

181 Wn.2d at 446. If the plaintiff fails to produce evidence of pretext, the defendant is entitled to dismissal as a matter of law. Kastanis, 122 Wn.2d at 491.

To establish a prima facie case of retaliation in violation of WLAD, a plaintiff must show "(1) he or she engaged in statutorily protected activity, (2) he or she suffered an adverse employment action, and (3) there was a causal link between his or her activity and the other person's adverse action." Currier v. Northland Servs., Inc., 182 Wn. App. 733, 742, 332 P.3d 1006 (2014).

Boeing argues Rahman did not present any admissible evidence showing the legitimate nondiscriminatory reasons to terminate him are a pretext or evidence of retaliation.

In opposition to summary judgment, Rahman submitted annotated e-mails and excerpts of depositions including the depositions of Boeing managers Fogelman, Patterson, and Yeaton; Project Data Management Specialist Naethe; Human Resources Generalist Trulson; and coworkers Jones and Okrent-Grilley. None of the deposition excerpts or e-mails create a material issue of fact. Rahman's annotations and assertions are conclusory statements that do not create a genuine issue of material fact of discrimination or retaliation. Grimwood, 110 Wn.2d at 359-60.

In addition, we note that when an employee is hired and fired by the same decision-makers within a relatively short time, "there is a strong inference that he or she was not discharged because of any attribute the decision makers were aware of at the time of hiring." Hill v. BCTI Income Fund-I, 144 Wn.2d 172, 189, 23 P.3d 440 (2001).[3] Here, Fogelman hired and fired Rahman within a seven-month period.

---

[3] Emphasis in original.

Rahman also argued he "engaged in a statutory protected act or conduct" when he "exercised his statutory right to file a complaint to Boeing [Human Resources] against untruthful CAMs and verbal warning by his manager Kari Fogelman." There is no admissible evidence that he submitted such a complaint to Boeing's Human Resources. In their declarations, Fogelman and Trulson state Rahman never complained about discrimination, retaliation, or harassment by Boeing or its employees while he was working at Boeing.

In opposition to summary judgment, Rahman presented no evidence of a hostile work environment. To establish a prima facie case of hostile work environment, a plaintiff must show " '(1) the harassment was unwelcome, (2) the harassment was because [plaintiff was a member of a protected class], (3) the harassment affected the terms and conditions of employment, and (4) the harassment is imputable to the employer.' " Loeffelholz v. Univ. of Wash., 175 Wn.2d 264, 275, 285 P.3d 854 (2012)[4] (quoting Antonius v. King County, 153 Wn.2d 256, 261, 103 P.3d 729 (2004)).

Rahman submits Naethe's deposition as evidence of a hostile work environment. Naethe's deposition testimony does not support his hostile work environment claim. In his deposition, Naethe denies there was a hostile work environment.

> Q.    (BY MR. RAHMAN)    . . . [P]laintiff stated to you, Kari Fogelman's harassment is continuous, and these acts are analogous to poking a sleeping dog.
> . . . .
> [NAETHE].    No, I don't recall that conversation.
> Q.    (BY MR. RAHMAN)    Did you socialize the word poking at workplace willfully, in a derogatory, sarcastic manner to create a harassing, unhealthy environment for plaintiff?
>
> . . . .
> [NAETHE].    No.

---

[4] Alteration in original.

Rahman also argues he was mistreated at work because he received verbal and written warnings without cause and was suspended without notice. However, Rahman received verbal and written warnings because he did not complete his work assignments and did not timely notify his supervisor of his absences. Further, the record shows Rahman received notice of his suspension during the July 31 Corrective Action Session when Fogelman gave him a suspension memo for his signature.

Finally, Rahman claims Boeing terminated him for using his sick leave to care for relatives in violation of the Family Care Act, RCW 49.12.270(1). The Family Care Act prohibits an employer from terminating an employee for exercising his right to use sick leave to care for a child, spouse, parent, parent-in-law, or grandparent of the employee. RCW 49.12.270(1), .287. Here, Rahman does not submit any admissible evidence suggesting he used or sought to use sick leave to care for a relative.

We affirm.

WE CONCUR: