# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| DAWN CORNWELL, | ) | No. 74919-6-I |
| Appellant, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| MICROSOFT CORPORATION, a | ) | |
| Delaware Corporation, | ) | UNPUBLISHED OPINION |
| | ) | |
| Respondent. | ) | FILED: June 5, 2017 |
| | ) | |

COURT OF APPEALS DIV I
STATE OF WASHINGTON
2017 JUN -5 AM 9:09
FILED

MANN, J. — The Washington Law Against Discrimination (WLAD), ch. 49.60 RCW, extends broad protection from retaliation to any person who has reported discriminatory conduct, as defined by the statute. In order to establish a prima facie case for retaliation, a plaintiff must show that (1) he or she engaged in statutorily protected activity, (2) he or she suffered an adverse employment action, and (3) there was a causal link between his or her protected activity and the other person's adverse action.

Patricia Cornwell filed an action for retaliation under the WLAD after she was terminated by Microsoft in 2012. Cornwell appeals the trial court's decision granting summary judgment after finding that Cornwell failed to present a prima facie showing of

No. 74919-6-I/2

causation between her protected activities and her ultimate termination. We agree with the trial court and affirm.

I

A.    Employment and Termination

Cornwell was hired by Microsoft as a customer service representative in March 1997. Cornwell worked in various roles, and was promoted several times, eventually earning the position of program manager in 2011. Cornwell's employment with Microsoft was terminated in September 2012, as part of a larger reduction in force (RIF), where three other employees in her group were also laid off.

In 2004, Cornwell was working as a readiness program manager and reporting to Lisa Chiang. Prior to her 2004 performance review with Chiang, Cornwell reached out to Chiang's manager, Todd Parsons. Cornwell expressed concern to Parsons that her performance rating might suffer because Chiang was dating one of Cornwell's male peers and was demonstrating favoritism.[1] Parsons reported the complaint to Microsoft's human resources (HR) and approximately a month later, Chiang was removed from having direct reports and assigned to a new role.

In 2005, Cornwell began reporting directly to Parsons. Once again feeling concerned that she would not be evaluated fairly, Cornwell sent an anonymous client survey to people she had worked with asking them to complete it. After receiving positive feedback, Cornwell copied the results to Parsons. After Parsons gave Cornwell

---

[1] Microsoft maintained a conflicts of interest policy prohibiting supervisors from being in a romantic relationship with a subordinate.

-2-

a negative performance review, Cornwell refused to sign it and informed Parsons that she would be involving HR.

Cornwell eventually retained an attorney and either threatened or filed litigation.[2] In a letter to Microsoft, Cornwell's attorneys described Parsons' behavior as being retaliation for Cornwell's original complaint about Chiang, which they described as being based on "discrimination/sexual favoritism." Cornwell and Microsoft ultimately negotiated a settlement. The settlement agreement included a confidentiality provision, barring the parties from discussing the matters involved. Following the settlement, Cornwell transferred to a different department and continued working, receiving promotions in 2008 and 2010. After reorganization, Cornwell became a program manager in 2011.

Mary Ann Blake began supervising Cornwell in November 2011. Blake's manager at the time was Nicole McKinley. In December 2011, Blake asked Cornwell to mentor with one of her friends. After seeing that Blake's friend reported to Parsons, Cornwell declined and explained that she would help find a different mentor. After further requests from Blake, Cornwell explained that "I did not feel comfortable because her friend reported to Todd Parsons, against whom I previously had a lawsuit." Cornwell told Blake that she could not discuss the details with her.

---

[2] The record before us includes a prelitigation demand letter and evidence of a settlement. The record does not confirm whether litigation was ever filed. We will refer to the 2005 events as the "2005 legal action."

In February 2012, Cornwell and Blake met for Cornwell's "mid-year" review.[3]
Cornwell describes the meeting as follows:

> In the review meeting she started the conversation saying "I followed up
> with HR about your lawsuit." She then said, "nothing is on file for you." I
> responded with "that is great!" She then said, "I mean did you sign
> anything?" I explained that I signed, my attorney signed, Todd [Parsons]
> signed, and Microsoft's attorneys signed. She said, "Oh! You had an
> attorney? I said, "Yes. That is what a lawsuit is, but I do not know why we
> are discussing this because it has nothing to do with my job, you, or
> anyone else, and I have been trying to put this behind me for years." She
> said, "What happens if we merge with Todd's team?" I said, "I have a copy
> of the paperwork with the terms and conditions, and if I need to produce
> that at a later time then I can." She then asked, "Do you want me to go
> back to HR and tell them that?" I said "No. I don't need you to do
> anything. I feel like you are overstepping your boundaries, and again this
> has nothing to do with my current role. I signed a confidentiality
> agreement and cannot discuss this with you." I then asked for the
> conversation to change, which it did. I was shocked that this was a
> primary subject of discussing at a performance meeting, and the
> conversation made me very uncomfortable.

Blake then provided Cornwell her performance feedback, including informing her
that she was trending toward a rank of "4" (the lowest being a "5"). Cornwell claims she
was shocked, and after further discussion, asked Blake to rewrite the evaluation before
the next round.

On April 13, 2012, Cornwell and Blake met again in a one-on-one meeting to
discuss Cornwell's performance. During that meeting, Blake again informed Cornwell
that she was trending towards a "4" rank. Cornwell expressed concern that she was
being unfairly reviewed. Following the meeting, Cornwell sent Blake a lengthy e-mail
challenging Blake's assessment of her work, challenging Blake's statement that she
was trending toward a "4," and expressing her dissatisfaction with Blake as a manager.

---

[3] In February, managers met with their employees for mid-year check-in meetings to discuss
performance. Although actual scores are not included in the mid-year review, managers often tell
employees they were trending to a certain performance score.

The e-mail also expressed surprise that Blake had "followed up with HR about my lawsuit."

Blake copied Cornwell's e-mail to McKinley and an HR representative. Blake expressed concern that Cornwell was "trying to build a case as to why she isn't a 4, paint a picture of me being confused, emotional and ineffective and acting like this came out of left field; rather than focusing on how we can work together." Blake asked for assistance from HR "because she makes me very nervous." Blake also reminded HR that Cornwell had told her that she had previously taken legal action against Microsoft "due to review scores in the past." There is no evidence Blake or McKinley had any further discussions with anyone at Microsoft concerning the prior legal action, or ever learned the nature of the previous litigation.

The parties dispute the events that occurred over the next two months. According to Blake, in June 2012, she began meeting with her management team with the initial recommendation that Cornwell be rated as a "4." After consultation with the other managers, and with the approval of McKinley, they decided to give Cornwell a final score of "5." Cornwell, however, provided a declaration from a former Microsoft senior director, Jean Wenzel, who was present at the managers meeting. According to Wenzel, Blake and McKinley discussed assessing Cornwell as a "5" during the initial review process. After the discussion was tabled, Blake and McKinley took the matter "off line" meaning the conversation would be continued without the others involved.[4]

---

[4] Microsoft's brief asserts "it is undisputed that multiple meetings occurred and the decision to rate Cornwell as a "5" was both difficult for the management team and was discussed by and communicated to all managers."

Cornwell's ranking was finalized as a "5" in August 2012. McKinley then approved the decision to include Cornwell in a reduction in force (RIF) involving three other employees in McKinley's organization. Because the RIF was a group layoff, Microsoft's HR team coordinated the notification to employees and all communications regarding the process of terminating employment. Microsoft informed Cornwell it was eliminating her position on September 5, 2012.

Microsoft had no written policy addressing final performance evaluation meetings for terminated employees. Cornwell's annual performance review meeting was instead replaced by the RIF meeting. HR told Blake not to inform Cornwell of her "5" ranking. After learning of her termination, Cornwell asked if she would be receiving her 2012 performance evaluation. She was told she would not receive a review. Before signing severance paperwork, Cornwell accessed the online HR files and determined all of her performance reviews except 2012 were available.

Microsoft terminated Cornwell's employment on September 5, 2012, and provided Cornwell with its standard severance agreement and release. On that same day, HR signed Cornwell's 2012 performance evaluation on behalf of Cornwell, because Cornwell was no longer an employee. HR then instructed Blake to upload the performance evaluation into the management tool. Once the review was "published," any other Microsoft manager would be able to see Cornwell's final review score.

Cornwell returned to Microsoft as a contract employee through an agency in May 2013. In February 2014, Cornwell applied for a Release Manager role at Microsoft. Cornwell already knew the manager, so she contacted him directly. They set up a phone interview. Before the interview started, Cornwell received an e-mail from the

hiring manager saying he could not interview her because of her last review on file. After Cornwell learned of the poor performance evaluation, she contacted Microsoft HR and requested the review be removed from her file. HR declined to remove the review.

In January 2015, Cornwell filed a complaint for damages claiming retaliation under RCW 49.60.210.

After discovery, including depositions, on December 30, 2015, Microsoft moved for summary judgment. On January 29, 2016, the trial court granted Microsoft's motion and dismissed all claims with prejudice. In its oral ruling, the court stated:

> The question here is whether there was retaliation due to protected activity. Where is that causal link? . . . Ms. Cornwell's complaint is a retaliation claim under the Washington law against discrimination, the WLAD, W-L-A-D, and there isn't evidence that Ms. Blake, who gave her the bad score, knew that there was a complaint under WLAD, and that's why I'm granting the motion for summary judgment.

After Cornwell's motion for reconsideration was denied, Cornwell filed a timely appeal.

II

A.    Standard of Review

We review summary judgment orders de novo. Keck v. Collins, 184 Wn.2d 358, 370, 357 P.3d 1080 (2015). Summary judgment is appropriate only when no genuine issue exists as to any material fact and the moving party is entitled to judgment as a matter of law. Keck, 184 Wn.2d at 370. When making this determination, we consider all the facts and make all reasonable, factual inferences in the light most favorable to the nonmoving party. Young v. Key Pharms., Inc., 112 Wn.2d 216, 226, 770 P.2d 182 (1989).

Mere allegations or conclusory statements of facts unsupported by evidence are not sufficient to establish a genuine issue. Baldwin v. Sisters of Providence in Wash., Inc., 112 Wn.2d 127, 132, 769 P.2d 298 (1989). Nor may the nonmoving party rely on "speculation" or "argumentative assertions that unresolved factual issues remain." Seven Gables Corp. v. MGM/UA Entm't Co., 106 Wn.2d 1, 13, 721 P.2d 1 (1986). "On summary judgment review, we may affirm the trial court's decision on any basis within the record." Davidson Serles & Assocs. v. City of Kirkland, 159 Wn. App. 616, 624, 246 P.3d 822 (2011).

B.   The Washington Law Against Discrimination

The WLAD was enacted to "eliminate and prevent discrimination in Washington." Currier v. Northland Servs., 182 Wn. App. 733, 741, 332 P.3d 1006 (2014); RCW 59.60.010. In relevant part, the WLAD declares as a civil right:

> The right to be free from discrimination because of race, creed, color, national origin, sex, honorably discharged veteran or military status, sexual orientation, or the presence of any sensory, mental, or physical disability or the use of a trained dog guide or service animal by a person with a disability is recognized as and declared to be a civil right. This right shall include, but not be limited to:
>
> (a) The right to obtain and hold employment without discrimination.

RWC 49.60.030(1)(a).

"The WLAD also extends broad protection to 'any person' engaging in statutorily protected activity from retaliation by an employer or 'other person.'" Currier, 182 Wn. App. at 742. RCW 49.60.210(1) provides:

> It is an unfair practice for any employer . . . to discharge, expel, or otherwise discriminate against any person because he or she has opposed any practices forbidden by this chapter, or because he or she

-8-

has filed a charge, testified, or assisted in any proceeding under this chapter.

To establish a prima facie case for retaliation, a plaintiff must show that "(1) he or she engaged in statutorily protected activity, (2) he or she suffered an adverse employment action, and (3) there was a causal link between his or her protected activity and the other person's adverse action." Currier, 182 Wn. App. at 742; Delahunty v. Cahoon, 66 Wn. App. 829, 839, 832 P.2d 1378 (1992). If the plaintiff establishes a prima facie case, then the burden shifts to the defendant who "may rebut the claim by presenting evidence of a legitimate nondiscriminatory reason for the adverse action." Currier, 182 Wn. App. at 743. If the defendant meets its burden, then the plaintiff must present evidence that the reason is pretextual. Currier, 182 Wn. App. at 743.

C.    Causation

It is undisputed that the second element of Cornwell's retaliation claim was met: Cornwell was terminated and was denied future employment by Microsoft. The first and third element are in dispute. But because we hold, as did the trial court, that Cornwell failed to provide sufficient evidence to support the causation element of her prima facie case for retaliation, we need not decide whether Cornwell's 2005 legal action was "protected activity" under WLAD.

In order to prove causation, the plaintiff must present sufficient evidence to show the protected activity was a cause of the adverse employment action. Wilmot v. Kaiser Aluminum & Chem. Corp., 118 Wn.2d 46, 70, 821 P.2d 18 (1991). The plaintiff need not show that retaliation was the only or "but for" cause of the adverse employment action, instead the plaintiff must show that the exercise of a statutory right protected by

-9-

WLAD was "a significant or substantial factor" in the adverse action. Allison v. Housing Auth., 118 Wn.2d 79, 85-96, 821 P.2d 34 (1991); Wilmot, 118 Wn.2d at 71.

"Because employers rarely will reveal they are motivated by retaliation, plaintiffs ordinarily must resort to circumstantial evidence to demonstrate retaliatory purpose." Vasquez v. State, 94 Wn. App. 976, 985, 974 P.2d 348 (1999). "Proximity in time between the adverse action and the protected activity, coupled with evidence of satisfactory work performance and supervisory evaluations suggests an improper motive." Kahn v. Salerno, 90 Wn. App. 110, 130-31, 951 P.2d 321 (1998).

It is essential when finding a causal link that the parties provide "evidence that the employer was aware that the plaintiff had engaged in the protected activity." Cohen v. Fred Meyer, Inc., 686 F.2d 793, 796 (9th Cir. 1982).[5] "[I]f the employee establishes he or she participated in an opposition activity, the employer knew of the opposition activity, and he or she was discharged, then a rebuttable presumption is created in favor of the employee that precludes us from dismissing the employee's case." Kahn, 90 Wn. App. at 131 (emphasis added).[6]

### III

Cornwell's primary argument on appeal is that "Microsoft as a corporation had knowledge of Cornwell's protected activity because Blake and others investigated Cornwell's prior 'lawsuit.'" Cornwell urges this court to adopt the "general corporate knowledge" principle for retaliation cases. According to Cornwell, under this principle,

---

[5] See also Clover v. Total Sys. Servs., Inc., 176 F.3d 1346, 1354 (11th Cir. 1999) (quoting Goldsmith v. City of Atmore, 996 F.2d 1155 (11th Cir. 1993)) (at a minimum, a plaintiff must generally establish the employer was actually aware of the protected expression at the time it took adverse employment action).

[6] See also Wilmot, 118 Wn.2d at 69; Graves v. Dep't of Game, 76 Wn. App. 705, 712, 887 P.2d 424 (1994); Yartzoff v. Thomas, 809 F.2d 1371, 1376 (9th Cir. 1987).

"the plaintiff is not required to show that the person who took the adverse employment action knew of the protected activity, but that the employer had 'general corporate knowledge' of the protected activity." Here, because someone in Microsoft's HR or LCA department may have known about Cornwell's 2005 legal action, this general corporate knowledge would be imputed to Blake and support a reasonable inference that Blake knew or suspected that Cornwell had engaged in protected activity.

For this argument, Cornwell relies primarily on Gordon v. New York City Bd. Of Educ., 232 F.3d 111 (2d Cir. 2000).[7] Gordon, however, does not fully stand for the principle urged by Cornwell. In Gordon, the court listed four elements for establishing a prima facie case of retaliation under Title VII: "(1) [plaintiff] was engaged in an activity protected under Title VII; (2) the employer was aware of plaintiff's participation in the protected activity; (3) the employer took adverse action against plaintiff; and (4) a causal connection existed between the plaintiff's protected activity and the adverse action taken by the employer." 232 F.3d at 116. In determining whether the "employer was aware" the court held, "[n]either this nor any other circuit has ever held that, to satisfy the knowledge requirement, anything more is necessary than general corporate knowledge that the plaintiff has engaged in a protected activity." Gordon, 232 F.3d at 116 (emphasis added).

However, when the court considered the "causal connection" element, it held, "[t]he lack of knowledge on the part of particular individual agents is admissible as some

---

[7] The WLAD was patterned after Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-2. Decisions interpreting Title VII are persuasive authority for interpreting the WLAD. Oliver v. Pac. Northwest Bell Tel. Co., 106 Wn.2d 675, 678, 724 P.2d 1003 (1986); Estevez v. Faculty Club of Univ. of Washington, 129 Wn. App. 774, 793, 120 P.3d 579 (2005).

evidence of a lack of a causal connection, countering plaintiff's circumstantial evidence of proximity or disparate treatment." Gordon, 232 F.3d at 117. Holding retaliation can be found "even if the agent denies direct knowledge of a plaintiff's protected activities, for example, so long as the jury finds that the circumstances evidence knowledge of the protected activities or the jury concludes that an agent is acting explicitly or implicit upon the orders of a superior who has the requisite knowledge." Gordon, 232 F.3d at 117 (emphasis added). Thus, the Second Circuit's approach in Gordon still requires that someone participating in the adverse action knows about the protected activity when determining if a "causal connection" exists.

No Washington case has relied on Cornwell's "general corporate knowledge" principle in a WLAD case, nor has the Ninth Circuit Court of Appeals in a Title VII case. For example, in Raad v. Fairbanks North Star Borough School Dist., 323 F.3d 1185 (9th Cir. 2003), the Ninth Circuit examined the knowledge necessary to demonstrate causation.[8] In Raad, the plaintiff, Raad, filed a complaint for unlawful discrimination in September 1992 after being unable to secure a permanent teaching position. In August 1993, after again being rejected for a permanent position, Raad demanded to see the school district superintendent and threatened to take action against the district. Raad, 323 F.3d at 1190-91. Subsequent to the August 13, 1993, event, Raad was turned down for teaching positions four more times by school principals. Raad claimed these four hiring decisions were retaliation for her August 13, 1993 activity. Raad, 323 F.3d at 1197. The Ninth Circuit held that the plaintiff failed to make the prima facie showing of

---

[8] In the Ninth Circuit, the plaintiff in a retaliation case under Title VII, must put forth evidence sufficient to show that "(1) she engaged in a protected activity, (2) she suffered an adverse employment action, and (3) there was a causal link between her activity and the employment decision." Raad, 323 F.3d at 1197.

causation because there was no evidence that the decision makers had knowledge of her August actions. As the court explained:

> In order to prevail, Raad must present evidence from which a reasonable trier of fact could conclude that the school principals who refused to hire her were aware that she had engaged in protected activity. Raad argues that her complaints regarding Kerr-Carpenter's 1992 hiring decisions were known to Moore and Gallentine, as well as to most principals, who were typically informed when discrimination complaints were made. However, Raad fails to point to any evidence in the record supporting her assertion that Layral and Thibodeau, the particular principals who made the allegedly retaliatory hiring decisions, in fact <u>were</u> aware of her complaints. Without any such evidence, there is no genuine issue of material fact.

Raad, 323 F.3d at 1197 (internal citation omitted).

We decline Cornwell's invitation to adopt the "general corporate knowledge" principle for retaliation cases. In accordance with existing law, Cornwell needed to provide evidence that Blake or McKinley had knowledge that she had engaged in protected activity prior to Cornwell's termination.

Cornwell argues alternatively that summary judgment was not appropriate because a jury could "reasonably infer that Blake suspected the legal issue was more likely than not a discrimination complaint or some other protected activity." But Cornwell offers no evidence supporting her claim Blake's knowledge of her past litigation was a substantial factor in her termination. Cornwell offers only that she informed Blake in late 2011 and early 2012 that she had been involved in litigation involving Parsons but that she could not discuss the details. There is no evidence that Blake knew, or ever learned the nature of the prior litigation outside of what Cornwell had told her. While Blake reached out to HR for additional information, she was informed by HR that it had no information.

-13-

No. 74919-6-I/14

The evidence, viewed in the light most favorable to Cornwell, demonstrates only that Blake knew of a prior legal action involving Parsons. There is no evidence Blake or McKinley knew that Cornwell's seven-year-old legal action involved protected activities. Cornwell's speculative argument is insufficient to defeat a motion for summary judgment. Cornwell failed to make the prima facie showing that Blake or McKinley had knowledge that she had engaged in a protected activity, or that the exercise of a protected activity was "a significant or substantial factor" in her termination. Summary judgment was appropriate.

Affirmed.

WE CONCUR:

-14-