# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

AARON "AJ" MITCHELL,

Appellant,

v.

KING COUNTY,

Respondent.

DIVISION ONE

No. 82347-7-I

UNPUBLISHED OPINION

DWYER, J. — Aaron Mitchell appeals from the trial court's order granting King County's motion for summary judgment with regard to his claims of failure to accommodate and disparate treatment. Mitchell asserts that the trial court erred by granting King County's motion for summary judgment on the failure to accommodate claim for two reasons. First, he argues that genuine issues of material fact exist as to whether he was qualified to perform the essential functions of his job. Second, he claims that factual disputes exist as to whether King County failed to affirmatively adopt available measures that were medically necessary to accommodate his conditions.

With regard to the disparate treatment claim, Mitchell contends that the trial court erred by granting King County's motion for summary judgment both because genuine issues of material fact exist as to whether he was doing satisfactory work and because King County medically separated him under circumstances that raise a reasonable inference of unlawful discrimination.

Because Mitchell fails to establish an entitlement to relief on any of his claims, we affirm.

I

In 2015, Aaron Mitchell was hired as a preventative maintenance specialist, or "oiler," for the solid waste division of King County's Department of Natural Resources and Parks (the Department). Mitchell's work as an oiler included pressure washing, changing the oil on heavy equipment, applying oil filters to equipment, and operating an oil truck.

On May 30, 2018, Mitchell injured his thumb while he was changing an oil filter. Subsequently, his thumb became infected. Mitchell went on medical leave for approximately one month.

On July 10, 2018, Mitchell's supervisor asked Mitchell to demonstrate how he had injured his thumb. During the demonstration, Mitchell fell into an inspection pit and injured his back. Mitchell then went on medical leave for approximately two months.

On September 5, 2018, Mitchell searched for a tool that was located inside a cabinet. While Mitchell was searching for the tool, the cabinet fell on Mitchell and he sustained an injury to his shoulder. Again, Mitchell went on medical leave. He never returned to work after this injury.

Following Mitchell's shoulder injury, King County received numerous communications from his healthcare providers regarding his physical and mental health. In an activity prescription form, dated September 10, 2018, Dr. Kodi MacLachlan stated that Mitchell was "not released to any work from . . . 9/10/18

2

to 9/26/18." This activity prescription form regarded Mitchell's thumb, back, and shoulder injuries.

Next, in an activity prescription form dated September 26, 2018, Dr. MacLachlan stated that Mitchell "may perform modified duty . . . from . . . 9/26/18 to 10/11/18."

However, on October 2, 2018, King County received a letter from Dr. Triet Nguyen, which provided, in full:

> To Whom It May Concern:
> Aaron Mitchell was seen in my clinic on 9/28/18. He is excused from work from 9/1/18 to 12/31/18.

According to a declaration by Lisa Aweeka, a senior human resources analyst for the Department, Mitchell's paid leave was set to exhaust on October 19, 2018. On October 12, Aweeka and Jamie Christensen, a disability services consultant for the King County Department of Human Resources, met with Mitchell "to discuss his leave status, leave without pay as an accommodation, and the process and information required to approve leave without pay after his protected leave expired." During this meeting, according to a declaration by Christensen, Christensen provided Mitchell with "a letter and medical questionnaire for his healthcare provider to complete and return to" King County.

In a medical questionnaire dated October 15, 2018, Dr. Nguyen stated that Mitchell was excused from work until December 31, 2018, because Mitchell was experiencing "[d]epression and anxiety. Feels hopeless. Having paranoid thoughts about co-workers." This medical questionnaire asked whether there were "any reasonable accommodations that may be considered that would allow

Mr. Mitchell to perform all of his essential functions as a Prevention Maintenance Specialist." Dr. Nguyen responded to this question by stating "No." Dr. Nguyen did, however, answer in the affirmative to the following question: "Will Mr. Mitchell be able to return to work and perform all the essential functions of his Prevention Maintenance Specialist position, with or without reasonable accommodation?" Dr. Nguyen stated that Mitchell's "expected to return to work" date was December 31, 2018. Finally, Dr. Nguyen stated that Mitchell "has been dealing with racism and a hostile work environment."

On December 24, 2018, Aweeka sent an e-mail message to Mitchell to confirm that he was released to return to work on December 31. Mitchell did not respond before December 31. Rather, Mitchell responded on January 1, 2019, stating that he was "currently seeking further doctor treatment for [his] Physical and Mental health" and that he was "still stressed" and "very concerned that going back too soon might cause [him] additional problems and aggravate [his] emotional distress."

On January 2, 2019, Aweeka responded to Mitchell's e-mail message and stated, in part, that, "[i]n order to consider additional continuous leave beyond 12/31/18, I will need to receive an update from your healthcare professional no later than end of business day, Monday, January 7, 2019." Mitchell did not respond to this e-mail message.

On January 11, 2019, Aweeka sent another e-mail message to Mitchell in which she requested further information "on or before end of Business day, Wednesday January 23, 2019."

4

That same day, Christensen sent a letter to Dr. Nguyen wherein Christensen explained that Mitchell did not return to work on December 31, 2018, and that the Department "requires an update from you regarding if Mr. Mitchell will be released to return to work (on a full-time basis) and whether they can offer any reasonable accommodations to help him perform the essential functions of his job upon his return." This letter also stated that the Department "will also consider providing another extension of medical leave as an accommodation if it is reasonable, medically necessary, and a definitive return to work date is provided." This letter requested that Dr. Nguyen respond by January 23, 2019. The record does not contain a response from Dr. Nguyen.[1]

On January 22, 2019, Mitchell sent an e-mail message to Aweeka in which he stated that he was "currently seeking further Treatment" and that he had "an appointment with [his] doctor on the 25th." Subsequently, Mitchell sent Aweeka a letter from Joshua Canady, a licensed mental health counselor, in which Canady stated that "Mitchell has an intake appointment for outpatient mental health counseling scheduled with me for February 21st, 2019."

In a letter dated February 7, 2019, Aweeka informed Mitchell that, "given the most recent information from Mr. Canady, King County is granting an extension of your accommodation [leave of absence without pay] from January 1, 2019 through March 1, 2019."

Thereafter, Canady diagnosed Mitchell with posttraumatic stress disorder and major depressive disorder. In a medical questionnaire dated March 1, 2019,

---

[1] King County's response brief states that "King County received no further information about Mitchell's non-occupational condition from Dr. Nguyen." Br. of Resp't at 11.

Canady stated that Mitchell required "at least 45 days" off from work "due to triggers at work."

With regard to Mitchell's physical conditions, in an activity prescription form dated January 31, 2019, Dr. Taylor Cox, a chiropractor, stated that Mitchell's prognosis was "poor for return to work." On February 12, Christensen sent a letter and medical questionnaire to Dr. Cox in which she requested, by March 1, further information regarding Mitchell's physical conditions. On March 26, Dr. Cox completed the medical questionnaire, wherein he stated that "[p]sychosocial factors are preventing full and complete recovery" and that "further chiropractic treatment will not be curative." Dr. Cox also stated that Mitchell's return to work "is dependent upon psychosocial limitations, as independent from physical accommodations," and that the tasks required by Mitchell's job "would likely exceed [his] pain threshold, given his difficulty with job training exercises with physical therapy." Additionally, Dr. Cox stated that Mitchell's job "is likely too demanding for him, and [he] will likely require new job training/placement."

On April 12, 2019, Pat McLaughlin, the division director of King County's Solid Waste Division, informed Mitchell by letter that King County would not accommodate an indefinite leave of absence and that the County was proposing a medical separation. In this letter, McLaughlin informed Mitchell that a Loudermill[2] hearing would take place on April 29, 2019. The letter specified that

---

[2] Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985).

6

Mitchell could attend either in person or via telephone and that Mitchell could submit further documentation regarding the proposed medical separation.

On April 19, 2019, Mitchell sent to Christensen an e-mail message, which provided, in full:

> Hello Jamie,
> I've started the process of enrollment into a different outpatient program.
> I located an OutPatient program (IOP) (Bayside Marin RTC & IOP)
> It last [sic] 10 weeks long in San Rafael, CA.
> Neurostim treatment in Lakewood,WA (The TMS treatment is 30 Days long) I will enroll in the TMS therapy after Bayside treatment is complete.
> 90 days Starting from May 17, 2019 Enrollment – Aug 20th 2019
> (Mon, Wed, Fri 10am – 1pm) or evenings
> Respectfully AJ

On April 24, 2019, Christensen responded to Mitchell's e-mail message and asked whether Mitchell planned to attend the scheduled Loudermill hearing. On April 26, Mitchell responded and stated that he "won't be attending the loudermill meeting." In a later declaration, Mitchell explained that he could not attend the hearing because he "had legal obligations on the same day."

On April 29, 2019, Mitchell's union representative, Al Cummins, attended the Loudermill hearing on Mitchell's behalf. In a deposition, Aaron Jeide, a human resources manager for the Solid Waste Division, stated that "the union was both aware and consenting that the Loudermill continue, even though Mr. Mitchell wasn't attending." Glynda Steiner, the deputy division director of the Solid Waste Division, presided over the Loudermill hearing. Steiner reviewed the details outlined in the letter that was sent to Mitchell in which McLaughlin recommended that Mitchell be medically separated. According to Steiner, "the

7

letter was . . . thorough and covered all of . . . the concerns that [she] had."[3]

Cummins did not provide any additional information regarding Mitchell's proposed medical separation.

---

[3] This letter provided a summary of the reasons why the Solid Waste Division was recommending that Mitchell be medically separated as follows:

Since June 2018 you have been on intermittent Family Medical Leave Act (FMLA) leave due to your current medical conditions. On September 7, 2018, you were placed on continuous FMLA medical leave and you have remained off work since then. On October 22, 2018, your protected leave under the FMLA\KCFML exhausted. Additional leave as an accommodation was granted from October 23, 2018, through December 31, 2018; with and extension through March 1, 2019, in the hopes that you would receive the necessary medical treatment to be able to return to work.

The following is a summary of the most recent medical documentation that we have received:

- September 28, 2018, medical note stated you were excused from work from September 1, 2018, through December 31, 2018
- October 15, 2018, completed medical questionnaire stated that you would be able to return to work and perform all essential functions of your Prevention Maintenance Specialist position with or without accommodation by December 31, 2018
- January 31, 2019, dated Activity Prescription Forms noted a poor prognosis for returning to work at your job of injury at any date
- March 1, 2019, completed medical questionnaire stated you needed to remain off of work for at least 45 days and your symptom reduction treatment was estimated to take anywhere from 3-12 months. Your provider was not able to "give analysis of employment capacity."
- March 26, 2019, completed medical questionnaire from your Attending Physician stated that your "job of injury is likely too demanding for [you] and [you] will likely require new job training/placement." Your attending physician also noted that "reviewing job analysis reveals lifting, push/pulling, and carrying that would likely exceed [your] pain threshold, given [your] difficulty with job training exercises with physical therapy." He further noted that you cannot perform the physical activities described in the Preventative Maintenance Specialist job analysis based on permanent limitations which he described as being "prognosis for RTW at JOI is poor, [you] require medical management of biopsychological factors influencing pain and RTW."

Additionally, you met with SWD Sr. Human Resource Analyst Lisa Aweeka and Disability Services Consultant Jamie Christensen on Thursday, March 28, 2019. At this meeting, you did not provide any updated information on your ability to return to work. You noted that answers regarding your ability to return to work should be directed to your treatment providers. Ms. Aweeka and Ms. Christensen reviewed the medical documentation they had received with you and explained that your providers were unable to provide any definitive return to work date. King County cannot accommodate an indefinite leave of absence. Therefore, SWD is proposing your non-disciplinary medical separation in accordance with the Reasonable Accommodation in Employment for Individuals with Disabilities Policy (PER-22-4-3-EP).

In a letter dated May 6, 2019—which was eight months after Mitchell had injured his shoulder—Steiner informed Mitchell that the "Solid Waste Division is upholding the proposed non-disciplinary medical separation of [his] employment" and that "[t]he separation is effective as of the date of this letter."[4]  In this letter, Steiner also informed Mitchell that Christensen "completed a review of [Mitchell's] transferrable skills and medical restrictions on April 8, 2019, and unfortunately could not find any open, non-promotional positions for which [Mitchell] would be minimally qualified to perform at this time."  In addition, this letter stated that Mitchell was eligible for King County's reassignment program for one year from the date of medical separation.[5]

After Mitchell was medically separated, he did not contact anyone at King County about utilizing the reassignment program.

---

[4] On May 3, 2019, a doctor performed an independent medical examination of Mitchell's thumb, back, and shoulder injuries for three workers' compensation claims.  The reports for these examinations concluded that, with regard to these three injuries, Mitchell was capable of returning to his position as an oiler as of May 3.  However, these reports were mailed to King County on May 15 and 16.  Thus, King County did not receive these reports until after Mitchell was medically separated.  In any event, the independent medical examination did not evaluate Mitchell's mental health conditions.

[5] In particular, this letter provided:
As a result of the decision to medically separate you, you are eligible for King County's Reassignment Program which provides eligible individuals who can no longer perform the essential functions of their King County position due to a disability, but can work in another capacity with six months of priority placement into non-promotional job vacancies for which they meet the minimum qualifications.  Eligible individuals can start Reassignment Program services immediately, or no later than one year from the effective date of medical separation.  King County Department of Natural Resources and Parks requested that the Reassignment Program Coordinator conduct a preliminary initial review of your transferrable skills and medical restrictions to see if you could immediately be placed into another open King County position you qualify for.  Jamie Christensen completed a review of your transferrable skills and medical restrictions on April 8, 2019, and unfortunately could not find any open, non-promotional positions for which you would be minimally qualified to perform at this time that fell within your medical restrictions.  Please contact Ms. Christensen if you have questions or would like additional information on the Reassignment Program.

On August 16, 2019, Mitchell filed a complaint in the King County Superior Court. In this complaint, Mitchell alleged that King County was liable to Mitchell for racial discrimination, retaliation, harassment, and religious discrimination. Mitchell subsequently filed an amended complaint, reasserting his original claims and further alleging that King County was additionally liable for wrongful termination in violation of public policy. King County moved for summary judgment with regard to the claims alleged in the amended complaint. The trial court granted this motion.

Before the trial court granted King County's motion for summary judgment with regard to the claims set forth in Mitchell's amended complaint, Mitchell filed a second amended complaint, which added claims of failure to accommodate and disparate treatment under the Washington Law Against Discrimination (WLAD).[6] King County filed a second motion for summary judgment with regard to these two additional claims. The trial court granted King County's second motion for summary judgment.

Mitchell appeals.

II

Mitchell first asserts that the trial court erred by granting King County's motion for summary judgment with regard to his failure to accommodate claim. According to Mitchell, genuine issues of material fact exist as to whether he was qualified to perform the essential functions of his job and whether King County

---

[6] Ch. 49.60 RCW.

10

failed to affirmatively adopt available measures that were medically necessary to accommodate his conditions. We disagree.

A

We review de novo a trial court's order granting summary judgment. Gibson v. Costco Wholesale, Inc., 17 Wn. App. 2d 543, 555, 488 P.3d 869, review denied, 497 P.3d 391 (2021). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). On review, we view all facts and their reasonable inferences in the light most favorable to the nonmoving party. Gibson, 17 Wn. App. 2d at 555-56.

WLAD is to be construed liberally to effectuate its purpose of remedying discrimination. Gibson, 17 Wn. App. 2d at 556. As a result, "summary judgment is often inappropriate in WLAD cases." Gibson, 17 Wn. App. 2d at 556. However, "summary judgment is still appropriate where the plaintiff fails to raise a genuine issue of material fact on one or more of the prima facie elements of a WLAD claim." Gibson, 17 Wn. App. 2d at 556.

B

To establish a prima facie case of failure to accommodate a disability, an employee must show that

> "(1) the employee had a sensory, mental, or physical abnormality that substantially limited his or her ability to perform the job; (2) the employee was qualified to perform the essential functions of the job in question; (3) the employee gave the employer notice of the abnormality and its accompanying substantial limitations; and (4) upon notice, the employer failed to affirmatively adopt measures that were available to the employer and medically necessary to accommodate the abnormality."

11

Davis v. Microsoft Corp., 149 Wn.2d 521, 532, 70 P.3d 126 (2003) (italicization omitted) (quoting Hill v. BCTI Income Fund-I, 144 Wn.2d 172, 192-93, 23 P.3d 440 (2001), abrogated on other grounds by Mikkelsen v. Pub. Util. Dist. No. 1 of Kittitas County, 189 Wn.2d 516, 404 P.3d 464 (2017)).

King County concedes "that Mitchell satisfied the first and third parts of the test."[7] However, King County asserts that Mitchell failed to demonstrate that genuine issues of material fact exist as to whether (1) he was qualified to perform the essential functions of his job, and (2) King County failed to affirmatively adopt measures that were available to it and medically necessary to accommodate Mitchell's conditions.

"An 'essential function' is a job duty that is fundamental, basic, necessary, and indispensable to filling a particular position." Gibson, 17 Wn. App. 2d at 559 (citing Davis, 149 Wn.2d at 533). "The ability to work a particular schedule can be an essential function." Gibson, 17 Wn. App. 2d at 559-60 (citing Davis, 149 Wn.2d at 535-36). Additionally, our Supreme Court has recognized that, "as federal case law shows, job presence or attendance may indeed be an essential job function." Davis, 149 Wn.2d at 534. Indeed, federal appellate courts have explained that, "'[e]xcept in the unusual case where an employee can effectively perform all work-related duties at home, an employee who does not come to work cannot perform any of his job functions, essential or otherwise.'" Samper v. Providence St. Vincent Med. Ctr., 675 F.3d 1233, 1239 (9th Cir. 2012) (internal

---

[7] Br. of Resp't at 17.

quotation marks omitted) (quoting E.E.O.C. v. Yellow Freight Sys., Inc., 253 F.3d 943, 948 (7th Cir. 2001)).[8]

Similarly, another federal appellate court has opined that an employee who could not work for six months was not capable of performing the essential functions of her job and, in turn, the employer was not required to keep the job available for such a duration to accommodate the employee:

> By her own admission, [the employee] couldn't work at any point or in any manner for a period spanning more than six months. It perhaps goes without saying that an employee who isn't capable of working for so long isn't an employee capable of performing a job's essential functions—and that requiring an employer to keep a job open for so long doesn't qualify as a reasonable accommodation. After all, reasonable accommodations—typically things like adding ramps or allowing more flexible working hours—are all about enabling employees to work, not to not work.

Hwang v. Kansas State Univ., 753 F.3d 1159, 1161-62 (10th Cir. 2014).

Consistent with these authorities, we have explained that "[r]easonable accommodation 'envisions an exchange between employer and employee where each seeks and shares information to achieve the best match between the employee's capabilities and available positions.'" City of Seattle v. Am. Healthcare Servs., Inc., 13 Wn. App. 2d 838, 857, 468 P.3d 637 (2020) (quoting Goodman v. Boeing Co., 127 Wn.2d 401, 408-09, 899 P.2d 1265 (1995)). "Once an employer is notified [of an employee's disability], it is 'the employer's burden to take "positive steps" to accommodate the employee's limitations,' although the

---

[8] In determining the scope of WLAD, Washington courts may look to federal case law. Kumar v. Gate Gourmet Inc., 180 Wn.2d 481, 491, 325 P.3d 193 (2014) ("Even though almost all of the WLAD's prohibitions predate [42 U.S.C. § 2000e-2(a)], the [Americans with Disabilities Act]'s, and the [Age Discrimination in Employment Act]'s, Washington courts still look to federal case law interpreting those statutes to guide our interpretation of the WLAD.").

employee also retains a duty to cooperate with the employer's efforts by explaining the disability and qualifications." Am. Healthcare Servs., 13 Wn. App. 2d at 857 (quoting Goodman, 127 Wn.2d at 408).

C

Mitchell failed to establish a genuine issue of material fact as to whether he was qualified to perform the essential functions of his job. Indeed, after approximately eight months, Mitchell's healthcare providers could not, following numerous requests, provide King County with a date by which he would be able return to work, with or without reasonable accommodations. Because Mitchell was not able to return to work after such a lengthy duration, he was not qualified to perform the essential functions of his job. See Davis, 149 Wn.2d at 534; Hwang, 753 F.3d at 1161; Samper, 675 F.3d at 1239.

Moreover, King County was not required to keep Mitchell's job position open for a longer period of time in order to accommodate his physical and mental health conditions. See Hwang, 753 F.3d at 1161. King County was, however, required to take positive steps to accommodate Mitchell's conditions. See Am. Healthcare Servs., 13 Wn. App. 2d at 857. And the record indicates that King County did exactly that.

After King County received the letter in which Dr. Nguyen stated that Mitchell was excused from work until December 31, 2018, Christensen provided Mitchell with a medical questionnaire to give to Dr. Nguyen. This medical questionnaire asked, "Are there any reasonable accommodations that may be considered that would allow Mr. Mitchell to perform all of his essential functions

as a Prevention Maintenance Specialist?"  Dr. Nguyen responded to this question by stating "No."

Additionally, in a letter dated January 11, 2019, and addressed to Dr. Nguyen, Christensen asked "whether [King County] can offer any reasonable accommodations to help [Mitchell] perform the essential functions of his job upon his return."  The record does not contain a response to this letter from Dr. Nguyen.

Next, after Canady diagnosed Mitchell with posttraumatic stress disorder and major depressive disorder, King County provided Canady with a medical questionnaire.  This medical questionnaire asked, "Is it medically required that Mr. Mitchell remain off of work while he seeks treatment with you?"  Canady responded in the affirmative and explained that it was medically required that Mitchell remain off of work "for at least 45 days due to triggers at work."  This medical questionnaire also asked, "Will Mr. Mitchell be able to return to work and perform all the essential functions of his . . . position, with or without reasonable accommodation (a copy of Mr. Mitchell's position's job analysis is attached for you to reference)?"  Canady responded, "I am a master's level clinician and due to agency regulations cannot give analysis of employment capacity."

Furthermore, in the letter informing Mitchell that King County was proposing a medical separation, McLaughlin invited Mitchell to attend a Loudermill hearing on April 29, 2019.  This letter also specified that Mitchell could attend either in person or via telephone, and that Mitchell could submit further documentation regarding the proposed medical separation.  This Loudermill

15

hearing provided Mitchell with an opportunity to present further information regarding his physical and mental health conditions. However, Mitchell did not attend the hearing. Moreover, Cummins, Mitchell's union representative who attended the hearing on Mitchell's behalf, consented to the Loudermill hearing proceeding as scheduled. At the hearing, Cummins did not provide any additional information regarding Mitchell's proposed medical separation.

D

The record also demonstrates that King County attempted to accommodate Mitchell's conditions through reassignment both before and after Mitchell was medically separated. See Griffith v. Boise Cascade, Inc., 111 Wn. App. 436, 444, 45 P.3d 589 (2002) ("Reassignment is a reasonable accommodation."). According to a letter dated May 6, 2019, wherein the deputy division direction informed Mitchell of his medical separation, Christensen "completed a review of [Mitchell's] transferrable skills and medical restrictions on April 8, 2019, and unfortunately could not find any open, non-promotional positions for which [Mitchell] would be minimally qualified to perform at this time." This letter also informed Mitchell that he was eligible for King County's reassignment program for one year from the date of the medical separation and advised him to contact Christensen with any questions regarding the reassignment program. However, Mitchell never contacted anyone at King County about utilizing the reassignment program.

E

Mitchell raises several arguments as to why he believes that genuine

16

issues of material fact exist as to whether (1) he was capable of performing the essential functions of his job, or (2) King County failed to take affirmative measures to reasonably accommodate his physical and mental health conditions.

First, Mitchell asserts that, in an e-mail message sent to Aweeka on April 19, 2019, he provided a return to work date of August 20, 2019. The referenced e-mail message provides, in full:

> Hello Jamie,
> I've started the process of enrollment into a different outpatient program.
> I located an OutPatient program (IOP) (Bayside Marin RTC & IOP)
> It last [sic] 10 weeks long in San Rafael, CA.
> Neurostim treatment in Lakewood,WA (The TMS treatment is 30 Days long) I will enroll in the TMS therapy after Bayside treatment is complete.
> 90 days Starting from May 17, 2019 Enrollment – Aug 20th 2019
> (Mon, Wed, Fri 10am – 1pm) or evenings
> Respectfully AJ

This e-mail message did not provide a return to work date. At best, this e-mail message states that, in the event that Mitchell was able to enroll in these two treatment programs, the programs would end by August 20, 2019.[9] Moreover, this e-mail message provides no indication that these programs would effectively treat Mitchell's physical and mental health conditions such that, by August 20, 2019, he would have been able to return to work and perform the essential functions of his job.[10]

Next, Mitchell contends that King County improperly relied on the opinion

---

[9] According to a declaration by Mitchell, Mitchell ultimately did not enroll in the Bayside Marin outpatient program "because [he] no longer had medical insurance." Instead, Mitchell enrolled in a different outpatient treatment program, which ended on September 14, 2019.

[10] Even if Mitchell provided a return to work date of August 20, 2019, Mitchell failed to establish a fact issue as to whether King County did not reasonably accommodate him. Indeed, had Mitchell returned to work on August 20, 2019, he would have been on leave for just short of

of Dr. Cox in deciding to medically separate him. According to Mitchell, Dr. Cox, as a chiropractor, was unqualified to opine on Mitchell's mental health conditions when he concluded that Mitchell's job was "likely too demanding for him." However, Dr. Cox stated that the tasks required by Mitchell's job "would likely exceed [his] pain threshold, *given his difficulty with job training exercises with physical therapy.*" (Emphasis added.) Such a determination did not, as Mitchell claims, plainly fall outside the scope of Dr. Cox's expertise as a chiropractor.

In fact, as of the date of separation, Mitchell had provided King County with no competent information from a health care provider regarding his mental health conditions and his capacity to work other than that from Dr. Cox. Indeed, the sole professional addressing these concerns was Canady who, by his own admission, was not competent to "give [an] analysis of employment capacity."

Finally, Mitchell asserts that a genuine issue of material fact exists as to whether King County adequately engaged in an interactive process in order to provide him with a reasonable accommodation. This is so, Mitchell argues, because King County did not inquire into the nature of his mental health conditions. According to Mitchell, "[w]ithout attempting to understand the nature and extent of Mitchell's mental health disability, King County could not have identified possible reasonable accommodations that would have allowed Mitchell to continue working."[11] However, as already explained, King County took positive steps to inquire into the nature of Mitchell's mental health conditions by

---

one year. As already explained, an employer is not required to keep a job position open for such a duration. See Hwang, 753 F.3d at 1161.

[11] Br. of Appellant at 24-25.

18

requesting both Dr. Nguyen and Canady to provide further information regarding these conditions in the form of answers to medical questionnaires. In any event, whereas an employer bears the burden "'to take "positive steps" to accommodate the employee's limitations, . . . the employee . . . retains a duty to cooperate with the employer's efforts by explaining the disability and qualifications." Am. Healthcare Servs., 13 Wn. App. 2d at 857 (quoting Goodman, 127 Wn.2d at 408). In other words, it was Mitchell who had a duty to explain his mental health conditions and qualifications to King County. As such, the record indicates that King County, by asking both Mitchell and his healthcare providers whether the County could provide any reasonable accommodations so that Mitchell could return to work, adequately engaged in the interactive process.

In sum, Mitchell failed to establish genuine issues of material fact as to whether he was qualified to perform the essential functions of his job and whether King County failed to take affirmative measures to reasonably accommodate his physical and mental health conditions. Accordingly, the trial court did not err by granting King County's motion for summary judgment with regard to Mitchell's claim of failure to accommodate.

III

Mitchell next contends that the trial court erred by granting King County's motion for summary judgment with regard to his claim of disparate treatment. This is so, Mitchell avers, because genuine issues of material fact exist as to whether he performed satisfactory work and King County medically separated

him under circumstances that raise an inference of unlawful discrimination. Again, we disagree.

In cases alleging disparate treatment under WLAD, Washington courts apply "the evidentiary burden-shifting scheme announced in *McDonnell Douglas*.[12]" Mikkelsen, 189 Wn.2d at 526. Under this framework, the plaintiff must first establish a prima facie case of discrimination. Mikkelsen, 189 Wn.2d at 527. Although the elements of a prima face case vary depending on the relevant facts, the parties agree that Mitchell was required to demonstrate that (1) he is a member of a protected class, (2) he suffered an adverse employment action, (3) he was doing satisfactory work, and (4) the action occurred under circumstances that raise an inference of unlawful discrimination. See Marin v. King County, 194 Wn. App. 795, 808-09, 378 P.3d 203 (2016).

If the plaintiff establishes a prima facie case of discrimination, "the burden shifts to the defendant, who must 'articulate a legitimate, nondiscriminatory reason for the adverse employment action.'" Mikkelsen, 189 Wn.2d at 527 (quoting Scrivener v. Clark College, 181 Wn.2d 439, 446, 334 P.3d 541 (2014)).

Finally, "if the defendant meets this burden, the plaintiff must produce sufficient evidence showing that the defendant's alleged nondiscriminatory reason for the adverse employment action was a pretext." Mikkelsen, 189 Wn.2d at 527. "'An employee may satisfy the pretext prong by offering sufficient evidence to create a genuine issue of material fact either (1) that the defendant's reason is pretextual or (2) that although the employer's stated reason is

---

[12] McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

20

legitimate, discrimination nevertheless was a substantial factor motivating the employer.'" Mikkelsen, 189 Wn.2d at 527 (quoting Scrivener, 181 Wn.2d at 446-47).

"Summary judgment for an employer is seldom appropriate in employment discrimination cases because of the difficulty of proving discriminatory motivation." Mikkelsen, 189 Wn.2d at 527. "To overcome summary judgment, the plaintiff needs to show only that a reasonable jury could find that discrimination was a substantial factor in the employer's adverse employment action." Mikkelsen, 189 Wn.2d at 528.

The parties agree that Mitchell was a member of a protected class and that he suffered an adverse employment action.[13] However, Mitchell asserts that genuine issues of material fact exist as to whether he was doing satisfactory work and whether the medical separation occurred under circumstances that raise an inference of unlawful discrimination.

To satisfy the requirement that an employee was doing satisfactory work, the employee bears the burden to establish that he or she "was doing satisfactory work *when the termination decision was made*." Griffith v. Schnitzer Steel Indus., Inc., 128 Wn. App. 438, 446, 115 P.3d 1065 (2005) (emphasis

---

[13] An adverse employment action means "'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" Marin, 194 Wn. App. at 808 (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998)). Although medical separation does not fit squarely within the examples provided in the quoted definition, medical separation is akin to termination and, therefore, it is an adverse action. See, e.g., Aki v. Univ. of California Lawrence Berkeley Nat'l Lab., 74 F. Supp. 3d 1163, 1175 n.4 (N.D. Calif. 2014) (stating that "medical separation" is "an adverse action"); El-Bey v. City of New York, 151 F. Supp. 2d 285, 297 (S.D.N.Y. 2001) (stating that an employee who was, among other things, placed on "unpaid medical separation leave" established "the 'adverse action' element of his *prima facie* case").

added); accord Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 58 (4th Cir. 1995) (stating that an employee performs satisfactory work when, "*at the time of the discharge*, she was performing her job at a level that met her employer's legitimate expectations" (emphasis added)).

On May 6, 2019, when Mitchell was medically separated, he had not performed his job for eight months. Approximately two months before Mitchell was medically separated, Canady explained, with regard to Mitchell's mental health conditions, that Mitchell required "at least 45 days" off from work "due to triggers at work." However, Mitchell subsequently informed Aweeka that he had "started the process of enrollment" into two treatment programs that would, at best, end on August 20, 2019. Moreover, approximately one month before Mitchell was medically separated, Mitchell's chiropractor, Dr. Cox, explained that the tasks required by Mitchell's job "would likely exceed [his] pain threshold, given his difficulty with job training exercises with physical therapy," and that Mitchell's job is "likely too demanding for him, and [he] will likely require new job training/placement." On this record, there is no indication that Mitchell, at the time he was medically separated, was performing (much less capable of performing) satisfactory work.[14]

Additionally, to satisfy the requirement that an adverse employment action occurred under circumstances that raise an inference of unlawful discrimination,

---

[14] Mitchell contends that "[i]t is more logical to examine Mitchell's job performance prior to his leave, which was satisfactory." Br. of Appellant at 33. However, a determination as to whether an employee was doing satisfactory work is made "when the termination decision was made." Griffith, 128 Wn. App. at 446; accord Ennis, 53 F.3d at 58. As already explained, there is no indication in the record that Mitchell was anywhere near being capable of performing his job in any manner, let alone satisfactorily, when he was medically separated.

an employee must "point[] to . . . evidence that [the employer] took an adverse action against him *because of* his protected class." Marin, 194 Wn. App. at 810 (emphasis added). Mitchell contends that a genuine issue of material fact exists to raise an inference of unlawful discrimination because Aweeka, in several e-mail messages, referred to Mitchell's mental health conditions as "Non-occupational" and "non-work related." Mitchell asserts that the language used by Aweeka is significant because, in previous e-mail messages, Aweeka referred to Mitchell's mental health conditions as "work related" and Christensen stated that Mitchell "mentioned that the reason why Dr. Nguyen has taken him off of work is related to his [on the job injury] claims." According to Mitchell, "[t]his stark change in language indicates discriminatory motive as there is a deliberate refusal to acknowledge the nature of Mitchell's disability."[15]

However, Mitchell fails to show how, exactly, these descriptions of his mental health conditions indicate that King County medically separated him because of his status as a member of a protected class. Instead, the record indicates that King County medically separated Mitchell only because, after eight months, neither he nor his healthcare providers were able to provide King County with a date by which he could return to work, with or without reasonable accommodations.

Because Mitchell failed to establish a genuine issue of material fact with regard to two elements of his prima facie case, the trial court did not err by

---

[15] Br. of Appellant at 33.

granting King County's motion for summary judgment on his claim of disparate treatment.[16]

Affirmed.

_____
Dwyer, J.

WE CONCUR:

_____    _____
Coburn, J.                         Appelwick, J.

---

[16] Mitchell also contends that he is entitled to an award of attorney fees on appeal pursuant to RCW 49.60.030. Because Mitchell is not a prevailing party, he is not entitled to an award of attorney fees.